LENA D. HUFFMAN, Appellee, v. MARTHA F. BEAMER, Appellant.

**GUARDIAN AND WARD:** Appointment—Close Scrutiny of Testimony.
1  The court will be quick to scan very closely the testimony on which
   a verdict has been rendered against the defendant in guardianship
   proceedings when the record demonstrates that the proceedings for
   the appointment of a guardian were not instituted *in the interest of
   the defendant,* but for the purpose of promoting the selfish interest
   of an expectant heir.   Testimony held insufficient to support the
   verdict.

**NEW TRIAL:** Unsupported Verdict—Timely Objection.   The insuf-
2  ficiency of the testimony to support a verdict is timely when made
   for the first time in the motion for a new trial.

*Appeal from Taylor District Court.*—A. R. MAXWELL, Judge.

MARCH 11, 1924.

REHEARING DENIED DECEMBER 11, 1924.

THIS is a proceeding for the appointment of a guardian for
the defendant, upon allegations of mental unsoundness.   The
proceeding was contested.   There was a verdict sustaining the
petition, and a judgment entered thereon.   The defendant ap-
peals.—*Reversed and remanded.*

*Spence & Beard* and *Wisdom & Kirketeg,* for appellant.

*W. E. Mitchell* and *M. R. Brant,* for appellee.

EVANS, J.—I.   The defendant is the mother of the plaintiff.
She is also the mother of E. D. Beamer, known in the record as
Dora Beamer, who is her only son.   He and plaintiff are her

1. GUARDIAN AND
   WARD: appoint-
   ment: close
   scrutiny of
   testimony.

only children.   Her husband, Zadock Beamer,
died May 30, 1916.   The plaintiff and defendant
were before us in a certain litigation following
the death of the husband and father, entitled
*Huffman v. Beamer.*   Our opinion therein appears in 191 Iowa

893. The facts in that case are the background of this, a statement of which will aid in an understanding of the evidence and questions presented herein. That was a case brought by the plaintiff against her mother and her brother, to set aside certain transfers made by this defendant to her son, Dora, and to establish her right to a share of said property, as the property of her father's estate. For convenience at this point, we adopt the statement of facts recited in the cited case.

"The essential facts of this case are as follows: Zadock Beamer and Martha Beamer, his wife, several months before his death, which occurred on May 30, 1915, deeded 240 acres of his 400-acre farm to his daughter, the plaintiff Lena D. Huffman, and 160 acres to the defendant E. D. Beamer, who is the son of Martha Beamer, but not of the deceased. At the same time, Mr. Beamer conveyed a residence and acreage property and two brick buildings in Clearfield to his wife. Before executing these instruments, he summoned plaintiff and defendant E. D. Beamer to his home, and informed them that he intended to make these conveyances; and, a couple of days later, deeds were executed and handed to the grantees for inspection, after which they were returned to the grantor, and filed for record in the proper county. In addition to the real property owned by him, deceased was possessed of money and personal property of the approximate aggregate value of $8,000. At the time of his death, certificates of deposit in different banks were held, as follows: One for $2,683.87, issued by the Iowa State Bank of Mount Ayr, bearing date October 22, 1915; one for $4,045.25, bearing date October 22, 1915, issued by the Mount Ayr State Bank; and one for $1,800, bearing date July 26, 1915, issued by the First National Bank of Clearfield. On June 5, 1916, the defendants went to plaintiff's residence, and requested her to go to Clearfield with them and have an assignment of the certificates and money above referred to, to Martha Beamer. In compliance therewith, plaintiff accompanied defendants to Clearfield, where the following instrument was prepared, signed, and acknowledged by her and by the defendant E. D. Beamer, in the presence of and before W. M. Long, notary public:

"'For value received, we hereby assign and set over unto

Martha F. Beamer all our right, title, and interest to any and all moneys belonging to the estate of our father, Zadock Beamer, which we may have acquired as heirs at law or devisee or legatee of our said father. Done this 5th day of June, 1916.'

"It is also claimed by defendants that plaintiff, at the same time, indorsed each of the certificates of deposit to her mother, by writing her name on the back thereof. She testified, however, that she had no recollection of having indorsed the certificates. On November 27, 1916, plaintiff and her husband borrowed $3,000 of Martha Beamer, giving therefor their note, due in one year. At the time of the marriage of Martha and Zadock Beamer, E. D. Beamer was about four years of age. He was never adopted by Zadock Beamer, but lived in the family until his marriage, which occurred about the time he became 21 years of age, and appears to have been treated by deceased the same as though he were, in fact, his son. Defendant does not appear to have known that Zadock Beamer was not his father, until about the time of, or shortly after, the latter's death, nor did plaintiff know that he was not her full brother until the day the deeds were executed. The 240-acre tract conveyed to plaintiff was apparently worth about $10,000 more than the 160-acre tract conveyed to E. D. Beamer. Martha Beamer, some time before the commencement of this suit, conveyed the store buildings, the value of which she estimated at $7,000, to her codefendant, and also gave him the $3,000 note signed by plaintiff and her husband. She gives as her reason for these transactions that she desired to equalize the shares of plaintiff and Ed Beamer. After the commencement of this suit, she conveyed what remained of her real property to E. D. Beamer, reserving, however, the right to the possession and use thereof during her life. Plaintiff, in her petition, alleges that she was induced to execute the written assignment referred to above, by the false pretenses and representations of the defendant E. D. Beamer that this was necessary, to enable her mother to collect the certificates, and to avoid the appointment of an administrator; that the real property conveyed to Martha Beamer was intended for her use only during her life; that such was the express understanding of all of the parties; that Martha Beamer,

disregarding her duty, appropriated the property to her own use, and conveyed or gave it to her codefendant. Plaintiff further alleges that she is the absolute owner of two thirds of all the personal property of which Zadock Beamer died seized; and asks judgment for the amount thereof, and that the real estate conveyed by Martha Beamer be impressed with a lien for the amount of plaintiff's claim. All of the allegations of plaintiff's petition not specifically admitted are denied by defendants. The value of the personal property and real estate conveyed to Martha Beamer was, at the time, about $20,000.''

In that case, the plaintiff's petition was dismissed and the conveyances to Dora were confirmed by decree of the district court, and such decree was affirmed here. After the determination of that suit, this proceeding was instituted. Since the former litigation, the mother and daughter have not been on friendly or even on speaking terms. Plaintiff, as a witness, frankly concedes that her motive in the bringing of this suit is to attack the conveyances made by her mother to the brother, and to protect her prospective interest as heir of her mother. The conveyances of land made by Zadock to his two children were joined in by the defendant. These conveyances included all the property owned by Zadock, save about $20,000 to $23,000 worth. This remnant was given to the wife, and freely accepted by her in lieu of her distributive share. It was her original consistent contention that, in the disposition of her property, she would equalize the inequalities of gift as between the children, arising from the fact that more land had been conveyed to the daughter than to the son. She has contended also that such was the expectation of her husband. The plaintiff has aggressively resisted that contention, and, without doubt, brought to bear a very cruel pressure upon her mother to yield to her demands. Failing to prevail upon her mother to recognize in her a right to one half of her mother's estate after her death, she started litigation in January, 1919, which, in one form or another, has continued ever since.

On appeal, many specific errors are assigned for our consideration, upon rulings of the court and upon its instructions.

But upon a careful study of the record before us, we deem it our duty to dispose of the case on its larger merits.

Theoretically, a guardianship proceeding is not adversary. It is supposed to be prosecuted and defended solely in the interest of the defendant.

In *Timonds v. Hunter*, 169 Iowa 598, 608, we said:

"No one other than the defendant has a legal interest in the result. And yet the correctness of the result is of the highest importance to the defendant. A judgment making the guardianship permanent puts him under disability as a *non compos mentis*. It not only deprives him of the present control of his property, but it renders him presumptively incapable, and perhaps conclusively so, of entering into any contract or making any testamentary disposal of his property."

And again:

"No one can be wronged by the granting of plenary remedy to him."

The proceeding bears some analogy to a will contest. In this class of cases, we scrutinize the verdict more critically and interfere more readily than in any other class of litigation. The reasons for such scrutiny are even stronger in a guardianship proceeding than in a will contest. The courts cannot fail to observe the natural tendency of selfish interest to abuse this proceeding, and to resort to it for wholly selfish purposes. The premature quarrels of expectant heirs are thrust upon the natural repose due to old age, and often result in despoiling the common benefactor and in destroying his status, and in depriving him of the liberty to do as he will with his own, and in compelling him to eat his own substance out of a stranger's hand. These are some of the considerations which impel the courts to scrutinize an adverse verdict in a case where a plaintiff is necessarily dominated by a consideration of his own supposed interest, rather than by a tender regard for the best interest of the defendant.

It will not be practicable to incorporate in this opinion any considerable details of the evidence, but we shall incorporate sufficient thereof to indicate its general character and its scope. On the question of mental soundness, the plaintiff presented

three witnesses whose testimony relates to personal transactions with the defendant. The evidence of each of these is very brief, and we shall incorporate it in the next division hereof, which division will be devoted solely to a presentation of evidence quoted from the record. In such quotations, we shall omit all objections and rulings.

II.    L. E. Hartman testified:

"Engaged in the hardware business at Clearfield. Dora Beamer, son of the defendant, bought the hardware for the defendant's new residence. I think I went down to her residence last fall, to set up a base-burner, I believe. Defendant was there. The stove had been used before. I think it had set in the room the year before. We moved the stove from one room into another, to put it up. She wanted it put just where it was the year before. Q. Did she say that to you? A. Yes, sir. The place had been her home the year before. Before the stove was placed, she telephoned for Dora's wife. When Dora's wife arrived, the defendant asked her where the stove had set last year. Q. And what was said? A. Well, she said she had forgot where it stood last year, *whether it was one joint of pipe out, or two joints of pipe.* Q. She didn't tell you where she wanted it placed herself? A. Not until she called Dora's wife."

Marie Baxter testified:

"Live in Clearfield. I expect I have known the defendant about six years. I am saleslady in the farmers' cash store, and wait on the trade. I see the defendant in the store about once a week. I observed that she was slow and forgetful. She would buy one thing and forget what else she wanted.

"Q. Would you be willing or would you be able finally to explain to her what she wanted to buy? A. I usually knew what she needed. Q. Did she ever make any purchase,—that is, bought the same article twice? A. I don't remember that she did that. Q. And how long have you observed that condition of Mrs. Beamer? A. Ever since I have been there."

E. V. Messler testified:

"Live in Clearfield. I have known the defendant five or six years. Part of the time was engaged at clerking. Clerked in three stores in the last five or six years. When I worked for

Grover, she called probably once or twice a week. I observed that sometimes she said, 'I declare, I wanted something else, but I can't remember what it was;' and by naming over articles, I could refresh her memory. Q. Was she able to tell you what she wanted to purchase on these various occasions? A. Once in a while. Q. Once in a while she could tell you what she wanted? A. Yes, sir."

The foregoing comprises all the nonexpert testimony predicated upon personal observation of the conduct of the defendant. However, two expert witnesses were used. The general dissertation on the subject of arteriosclerosis and objections and rulings being omitted, and all the examination as it related to the case of defendant being included, Dr. Witte testified as follows:

"I have been superintendent of the state hospital at Clarinda, Iowa, for twenty-three years; a practitioner of medicine for over forty years; have had the care of many thousand of cases of mental and nervous troubles. Recently examined Mrs. F. Beamer at her request. She is about 75 years old. Q. Did you make any examination of her arteries and circulatory system? A. Yes, sir. At the time of the examination, she was at her home in Clearfield, Iowa. Mr. Spence, Dr. Reed, and her son were present a part of the time, and Mr. Spence all of the time. Her arteries were affected by arteriosclerosis. That disease causes a hardening, and the caliber of the arteries is lessened, and they do not carry the normal amount of blood, and they are not so elastic. Arteriosclerosis is a disease common to old age—very much so. It appears in different individuals at different ages,—sometimes as early as fifty, and sometimes it does not appear at all. There are certain brilliant old people that never have it. Ordinarily, if it begins at all, it is about in the sixties, and proceeds assiduously to the end. Q. What have you to say, doctor, as to this condition that you found in Mrs. Beamer, as to what the prognosis would be or could be. A. Do you mean so far as mentality is concerned? Q. No, I mean her—her general condition, her physical condition? A. It will not improve. It will continue to become more marked as time advances. Q. Could you tell from your examination there

of Mrs. Beamer, as to about how long she had had this malady?
A. No, I could not. The memory of recent events is the first
faculty to be impaired; the intellectual power of discerning re-
lations,—the discursive faculty. The will, one of the functions
that is necessary to transact business in a clear and intelligent
way, is impaired. There is apt to be a loss of the independence
of will power gradually; it would not come suddenly. * * * I
ascertained her condition by palpating,—that is, feeling the ar-
teries with my fingers. Q. Did you make any tests as to this
woman's memory, Doctor? A. Yes, sir. Q. And how did you
find it? A. Somewhat defective for recent events, but good for
past events. Just what I would expect to find from hardening
of the arteries.''

                          Cross-examination.

''I was employed by Mrs. Beamer; was subpoenaed by the
other side. I had a sort of promise by Mr. Brant, one of the
attorneys, to be paid my regular fee, $50 per day and expenses.
I examined the arteries by touching the hand, and also those
leading to the brain. By blood pressure is meant the force
exerted by the blood on the walls of the arteries; and if high,
it would indicate that the action of the heart is unusually strong.
A low pressure does not indicate, altogether, that there is no
hardening of the arteries, if it is intermittent. I went to the de-
fendant's house for the examination, and after reaching there,
knew that she had prepared dinner for four or five of us that
day. I went over the house and found it in apple-pie order, neat,
clean, and showing very much taste, and was in the best of order,
and cleaner than the average house, and her person was neat, or-
derly, and tidy. At any advanced stage of the disease, an elderly
person with impairment of the mental faculties would not, prob-
ably, be cleanly and neat in her habits. The defendant is not in
an advanced stage. The hardening is just beginning. I would
say that three years ago she was normal. Worrying over the
death of her relatives and litigation and threatened litigation
might tend to produce the condition that I have observed. It
would help it, and it might produce the effect; and the longer
the litigation was protracted, the more it would affect her con-

dition. One of the first indications of artery-hardening is a loss of strength and a general debility. I saw nothing of that in this defendant. I think she is astonishingly strong and energetic. If the subject had been neat and cleanly in person and habits before, then a failure in these particulars would indicate hardening of the arteries, and if the neat and cleanly habits continued, it would indicate the reverse. * * * Q. What do you say as to whether or not her mental faculties have been affected seriously? A. From my examination of her, I would say that she was able to conduct the ordinary affairs of her life at this time, but not the extraordinary ones. * * * A. I would say, not very seriously; it is a matter of degree, and it would be hard to determine. I did not take her blood pressure, and do not know what it was that day. Talked with her about past and present events. The conversation occurred after the defendant had prepared dinner for five or six men, and after disposing of it, and after she had cleaned up and washed the dishes and dressed herself. Such exertions and the time of day would affect the clearness and scope of her memory.''

Dr. Dunsmore, another expert, was called by the plaintiff. This witness was in the court room as an observer of the defendant upon the witness stand during the examination of the witness in this case. He made no other or different examination of her than by such observation. Omitting again all dissertation on the general subject of mental unsoundness, this witness testified:

''I felt satisfied that the defendant is suffering from senile dementia. It cannot be cured. It is my opinion that she is of unsound mind. Q. Do you think that she had the mental capacity, from your observation of her, and hearing her testimony here, to manage transactions looking *after the sale of real estate, aggregating at some times five or six thousand dollars, and at other times three thousand dollars, and property managing conserving transactions of that character?* A. I think not. Q. Do you think, Dr. Dunsmore, that this Mrs. Beamer, as she appeared here on the witness stand today, and as you observed her, has *sufficient mental capacity to conserve property aggregating fifteen or twenty thousand dollars, and paying taxes,* and collecting

interest and rent and protecting her property against any persons who might desire to get it from her for a little or nothing? A. I think not. Q. Now, doctor, assuming that this woman had hardening of the arteries, and remembering her as she exhibited herself upon the witness stand here today, and after hearing her testimony, what have you to say, in your judgment, as to whether or not Mrs. Beamer is susceptible to suggestion? A. It is my opinion that she would be very susceptible to suggestion.''

### Cross-examination.

''Q. How much compensation do you get in this particular case for your opinion? A. Well, we didn't strike any bargain; I'll probably charge $200 and my expenses. Q. Did you consult with attorneys for the plaintiff and let them know what kind of an opinion you could furnish in this case for $200 and expenses? A. I certainly did. Got a detailed history of the case from counsel for the plaintiff. Q. Then the opinion you have given to the jury is not based altogether on the evidence? A. Not exactly. My opinion is based in part upon what I saw of the defendant upon the witness stand and *in part upon what I have been told outside of court.* Loss of memory for recent events is one of the things that we look for in a case like that of the defendant. Q. And how else would you expect this disease to betray itself? A. Interference in her judgment. I could not discover that by looking at her. The third evidence is loss of will power. Does not believe that defendant has had the will power to follow a given course for two or three years. * * * Q. At about what age does senile dementia most frequently occur? A. There is no rule for that; it is foolish for me to try to answer that; it is not a scientific fact. Q. Then there is no connection between arteriosclerosis, or hardening of the arteries, and senile dementia? A. A very close connection. Q. But not one of them that you can give the age at which it most frequently occurs, and it is foolish to ask that question? A. I can't give an answer to such questions; that occurs, as I have said, at different ages. * * * Q. Are you able to stand off and look at a given subject, or hear him testify, and then tell whether the

sclerosis is just beginning or has long progressed? A. Why, no, I would not attempt to speak of a person as having sclerosis by looking at them. Q. And you can't tell whether this defendant had arteriosclerosis in an incipient stage, or whether it was of long duration? A. I don't know anything about arteriosclerosis in this defendant; I didn't testify to that. Q. So you don't know whether she is suffering from arteriosclerosis or not? A. I don't know, only by what Dr. Witte has said. Q. I am asking you the question from your personal knowledge. A. No, sir; from my personal knowledge, I don't know anything about the arteriosclerosis. Q. Then the only thing that you have personal knowledge of is senile dementia? A. The senile dementia is the main thing, but that is not the only thing; her symptoms are such that they show it.''

The foregoing comprises all the testimony contained in this record, expert or nonexpert, on the question of defendant's mental soundness. We shall recur presently to a more detailed consideration of it. The defendant herself was called to the witness stand by plaintiff, and was interrogated by plaintiff's counsel. The plaintiff here places special reliance upon the examination as furnishing the most cogent evidence in the record of the mental disability of the defendant. We have carefully read this examination. It will be impracticable to incorporate herein even the substance of it. The first two or three pages thereof will be sufficiently illustrative of the whole, and we set out so much thereof as follows:

''I am 75 years old the 22d of February next. Was born in 1846 in Pennsylvania. Came to Ringgold County, Iowa, in 1865. Moved to Clearfield about 23 years ago. My husband died May 30, 1916. My husband left me the drug-store, and I gave it to my son, Dora Beamer, who is here. I valued the drug-store at $3,000, and gave it to him to equal him up. I will say he paid $3,000. He did not give me $3,000 in money nor a check. He would have done so, if I had asked it. Q. Did he give $3,000 in money? You know what money is, don't you? A. Well, I have an idea I do. Q. Did he give you $3,000 in money? A. Just as I told you. Q. Don't you know whether he paid you anything or not? A. I reckon he did. Q. Well,

what did he pay? A. Well, he paid me $3,000. If you want to let me explain it, I will. Q. Did he give it to you in money?. A. No, sir. Q. What did you do with the $3,000? A. I gave it to him. Q. You gave it to him? A. Yes, sir. Q. Then he never gave you the $3,000? A. I said I gave it to him. Q. Just answer my question. He never paid you any $3,000 in money? You know that he didn't, don't you? A. I don't remember that. Q. What did you do with the $3,000 that he gave you? A. What did I do with that $3,000? I gave it to him. Q. That is, did he give it to you and then you give it back to him? A. No, sir. Q.- I want to know, Mrs. Beamer, if you put any of this money that he gave you in the bank,— this money for this store building? * * * Q. Now, Mrs. Beamer, let's begin over; how did you convey this land to Mr. Dora Beamer? A. I gave it to him. Q. How did you convey it? A. I gave him the drug-store. Q. I don't believe you understand me. How did you give this land to him,—this drug-store we are talking about? A. Well, I gave it to him; we valued it at $3,000. Q. But how was the conveyance made? Was there a deed of conveyance or anything? How did you give it to him? A. I gave it to him to equal him with my daughter. Q. That is not what I have asked you. A. Well, that is what I did. Q. I want to know how it was that you conveyed this drug-store to your son, Dora. A. I don't understand you. Q. Do you know how it was done? A. It was given to him. Q. What did you mean when you say you gave it to him; do you mean that you conveyed it to him on a deed? A. I never done so very much business; my son was left to take care of me. Q. I just wanted to know if this property was given to you by your husband? A. He did; yes, sir. Q. To you? A. Yes, sir. Q. Then how did your son get the property? A. Because I gave it to him, and also a $4,000 mortgage. Q. Isn't it a fact that you deeded this drug-store to your son? A. I surely did. Q. Do you understand what I mean when I say, when I ask you, if you deeded it to him, or conveyed it to him? A. Yes, sir; I understand it. Q. I want you to say whether you deeded it to your son. A. I certainly did. Q. And who drew the deed? A. Mr. Long. Q. Where were you when the deed was

made, or written? Do you know where you were? A. We were in his office. Q. In whose office? A. Wilbur Long's. Q. How long have you known Wilbur Long? A. Oh, I have known him for about 23 years."

The plaintiff testified at length concerning her negotiations with her mother on the subject in controversy. The following is sufficiently illustrative of her testimony:

"I had a conversation with her again about Christmas, 1918, about the property that my father left to her. She said she was going to turn the money and notes that was out to equal him up on the 80 acres. Q. Now, was there anything said in that conversation about what had become of the drug-store? A. Yes, sir. Q. All right. Was that conversation confined to the drug-store and the Burg $4,000? A. Yes, sir. Q. Making $6,000 worth of property? A. Yes, sir. Q. Now, what was said there? A. Well, she said she was giving him that much, and that she would have to give him enough to make him $13,000. Q. Well, you may go on and tell the conversation. A. Well, I said, 'Ma, I don't think there is any evening up to do, in my estimation;' that pa had left what he had deeded to me and Dora, and the rest to her, and was to be divided equally at her death, and she said that he said to equal it up, and that it would take $13,000 to equal it, and I says, 'How are you going to equal him?' and she says, 'I have already given him the drug-store building and the Burg mortgage and the other notes.' Q. Then what did she say? A. She told of different notes, and I says, 'That won't be enough to even him, and how are you going to finish it?' and she says, 'You know your note of $3,000,— I can give him that;' and I says, 'Ma, are you going to turn our note over to him, too?' and she said she was; and I says, 'You know what you said when we got that money, that we could have it as long as we wanted it and paid the interest;' and she says, 'I think you can get it of Dora the same way;' and I says, 'I don't think there was any evening up to do;' and I says, 'There is a mistake, and have you ever stopped to think what you are doing,—if you turn this money all over to him, why, you ain't going to have a bit of income, it will all be Dora's;'

and she said, 'Lena, my pension is keeping me since your father died.' ''

III. If there is any fair support for the verdict in the record, it must be found in the contents of the foregoing division. We discover nothing in the examination of the defendant herself which can be said to indicate mental unsoundness in a legal sense. The examination conducted was frankly hostile, and took all the privileges of a cross-examination. The answers of the witness respond fairly thereto, and indicate as much comprehension of the questions as could fairly be expected from any witness of like experience whose vocation had never before brought her into the court room. The interrogation itself was not free from fault. We have to say, therefore, that the testimony of the defendant, as it appears in this record, does not impeach her mental soundness. Going directly to the testimony hereinbefore quoted, the circumstances related by the nonexpert witnesses Hartman, Baxter, and Messler, are literally trifling in their insignificance. If any one of the distinguished counsel on either side in this case were put to the same test as a criterion of mental soundness, and were asked to state how many joints of pipe extended between his furnace and his chimney, could he save his status as a *compos mentis?* And yet the full offending of the defendant was the failure to answer such a question.

None of the nonexpert witnesses ventured an adverse opinion as to the mental soundness. There was nothing in the facts testified to by either that would justify an adverse opinion either by the witness or by the jury. The testimony of Dr. Witte in its entirety, standing alone, would justify a directed verdict in favor of mental soundness. The defendant's last disposition of property had been made February 15, 1919, which was nearly three years prior to the time of the trial. According to Dr. Witte, she was normal then, and her disability only incipient now. He testified to her competency to attend to her ordinary affairs. She *was* attending to them in her household, under the observation of the doctor. She had no extraordinary duties confronting her. The testimony of Dr. Dunsmore, as it appears in this record, is of very doubtful value. The hypothetical ques-

tions put to him were predicated upon a necessity confronting this defendant of managing and conserving and renting many thousand dollars worth of property. No such hypothesis was justified by the record. She had long previously made full disposition of her property. There was no presumption that she was under disability at that time. Moreover, this witness based his judgment "in part upon what I have been told outside of court." It is quite suggestive that expert opinion should be relied on quite exclusively in order to justify guardianship for this defendant in the management of her affairs. If she were mentally unsound, it ought to be reasonably apparent to many people who came in personal contact with her. These experts were produced theoretically in the interest of the defendant and theoretically at her expense. Yet they made only a cursory examination. They did not even ascertain her blood pressure. This was shown by other testimony to be 120 systolic and 70 diastolic. The utmost that can be said upon this record adverse to the mental soundness of the defendant is that she has incipient arteriosclerosis. This is not mental unsoundness, within the meaning of the law.

The record affirmatively discloses that she is able to manage her own affairs and to command capable assistance of her own choosing; that she has at all times comprehended fully her property in all its details, as well as the proper objects of her bounties; that she has had a definite will as to what she wanted to do with her property; and that she has been frank and open about it in her associations with her daughter; that, from the time of her husband's death, it was her fixed purpose first to equalize the bounties of herself and her husband, as between her children; that she had equal affection for both of them; that she believed intelligently that it would take approximately $12,000 to equalize the gifts to the son with those to the daughter; that she purposed to divide equally between her two children the amount of her property over and above $12,000; that her changed attitude later was the direct result of the unfriendly conduct of her daughter; that, in her disposition of her property, she has done exactly what she wanted to do, and has never repented it; that her son has at all times met all her expecta-

tions; that the fact that she abandoned her purpose to give her daughter anything is, under the circumstances surrounding her, not inconsistent with mental competency. The plaintiff has been very aggressive, and has forfeited much of the motherly consideration which would otherwise be due her. We refrain from commenting upon the very deep wound which she inflicted upon her mother before the litigation began. This was done only because the mother insisted upon her purpose to equalize as between her children.

Having reached this conclusion upon the larger merits of the case, it is hardly worth while that we deal in this opinion with specific errors assigned. Some errors are apparent in the record. The case was not consistently tried. It cannot be said from the record whether the question of undue influence was deemed material or not material; whether it was in the case or out of it. The former conveyances of property were all proved, but the reasons which impelled such conveyances were largely excluded. The result was that the jury was allowed to infer undue influence by reason of the voluntary conveyances. There was no evidence of undue influence, except the mere fact of the voluntary conveyances. Instructions 6, 7, 8, and 11 are subject to criticism. We put our reversal, however, upon the ground of the insufficiency of the evidence to support the verdict. We do not overlook the point made that defendant's counsel did not move for a directed verdict at the close of the evidence. How-

2. NEW TRIAL: unsupported verdict: timely objection.

ever, they did urge the insufficiency of the evidence to support the verdict, in their motion for a new trial. This was not too late.

For previous cases, see the following: *McDermott v. Rahely*, 146 Iowa 458; *McGuire v. Moorhead*, 151 Iowa 25; *Caltrider v. Sharon*, 164 Iowa 287, 292; *Graham v. Clapp*, 191 Iowa 1224

For the reasons indicated, the judgment below is reversed.— *Reversed and remanded.*

ARTHUR, C. J., PRESTON and FAVILLE, JJ., concur.