GEORGE W. PERRY, Appellant, v. W. A. ROBERTS, Guardian, Appellee.

304

June 26, 1928.

*Steele & Miles*, for appellant.

*O. M. Slaymaker* and *R. E. Killmar*, for appellee.

Kindig, J.—On the 26th day of January, 1924, the district court of Clarke County appointed W. A. Roberts guardian of the appellant, George W. Perry, in an action wherein Maggie Thompson was plaintiff, and appellant defendant. The cause for such guardianship was mental incompetency. Qualification was immediately made by the guardian, and he at once entered upon the duties of his office, by taking possession of appellant's property for the purpose of paying his debts and preserving the remaining assets, to the end that appellant might be fed, clothed, and given the conveniences of life. This appointment was specially confirmed by order and judgment of the same court on the 5th day of January, 1925. Afterwards, on August 14, 1926, the petition was filed in the present proceeding, asking for the removal of the guardian and the return of the property to the appellant. That application was denied, on the theory that the ward had not recovered from his mental incompetency. It is from this finding and judgment that the appeal was taken.

I. In order to understand the facts which were before the court in the present controversy, it is quite necessary to review

the original record upon which the guardian was appointed in the first instance.

George W. Perry, the appellant, is now approximately 68 years old; so, when the guardian was named, the ward was about 64 years of age. He was never married. During practically all his adult life he lived on a farm. Prior to the year 1917, he accumulated, through his own efforts, 240 acres of land in Clarke County, and in addition to this acreage, the appellant owned personal property. When the land boom of 1918, 1919, and 1920 swept the state, the ward purchased another 80 acres, agreeing to pay $10,000 therefor. By reason of acquiring this additional tract, appellant was compelled to, and did, obtain a mortgage of $13,500 on the 240 acres.

Deflation, as is well known, followed the inflation, and appellant could not pay his interest. More than this, he had incumbered his holdings with a second mortgage. Little, if any, income was received from this entire real estate, and it appeared inevitable that the same would be lost to appellant unless a more capable manager was placed in charge thereof. Not only had appellant burdened himself with the heavy mortgage indebtedness (this was not an unusual condition for that period), but also his financial interests were met with the hazard that he possessed insufficient mentality to cope with the problem.

As a result of that inefficiency, the ward neglected his farm and live stock to such an extent that he derived no profits from the industry. For instance, he permitted the land to grow up with cockleburs, and thereby smother the crops. His stock was ill kept and poorly fed, and it was allowed to roam upon the fields and premises of others. What little grain appellant did produce was permitted by him to be taken by his horses and cattle before the same was threshed. Being careless of the rights of others, and his own interests too, appellant let his male animals remain uncastrated, to the constant danger of his neighbors' herds and the actual injury to his own. Large portions of the fields remained uncultivated. Attempt was made to lease part of this land, but that venture proved a failure, because appellant disagreed and quarreled with his tenants to the extent that it was impossible for him to obtain new ones to properly farm the premises.

Consequently, it appeared quite evident, and was so found

by the district court, that the only way to save appellant's investments for him was to place the property under the custody and management of a guardian; and this was true, not because the ward merely lacked the ability to properly manage, but due to his mental incapacity. Moreover, it was plain that appellant's health was in jeopardy, because he lived in a very unclean condition; his house was ill kept, dirty, and unsanitary,—partly, at least, without floors. Stock lived therein, and there was housed with him a large number of dogs and cats. One witness declared that even the offal from these animals was allowed to remain in this dwelling place. Such uncleanliness did not aid appellant's mental development, but rather caused further decline.

While originally appellant's condition was such that he was able to accumulate the wealth before mentioned, yet apparently during his later years he has become less and less capable of managing his own affairs.

At the hearing in the case at bar, the evidence was very similar; in fact, it is clear that appellant is losing, rather than gaining, ground. Mr. Perry possesses a very obstinate mind. Such mental status is so marked that it is a defect. There appears to be no danger that anyone can get his property from him, but rather, because of this peculiar stubbornness, he would lose his holdings through mismanagement. A difference of opinion expressed by another tends to fuss and upset him. Dr. W. F. Dean, on behalf of appellant, said:

"He is not up to the standard of ordinary mentality. He could not be easily influenced out of property, I think. I think he would not be easily confidenced out of his property. He might not be able to run it and get an income out of it. Q. Would you say that he was insane? A. Not insane; he is below the ordinary mentality. He is mentally deficient."

Notation should here be made, too, of the fact that this ward has a continual desire to purchase more real estate. The idea itself may be in line with strict business principles, but such enterprise cannot be carried out under appellant's own administration.

Because of the overdue indebtedness before mentioned, it was necessary for the guardian to sell the land, in order to avoid

sheriff's sales and the resulting loss of equities. But after so doing, there was still left in the hands of the guardian $7,500 in cash and two pieces of town property, fairly valued at $3,000 or $4,000,—all of which is actively producing income for the ward. Through careful handling, this small estate will support and maintain the ward; but if he is given the right to obtain and operate it himself, it is quite likely to be reinvested in lands, with the disastrous result, no doubt, of the previous experiences in this field of endeavor. This future failure will be, as well as that of the past was, due to appellant's defective mentality, rather than (as argued by him) the country's general financial condition.

II. Appellant based his action for the release of the guardianship upon Section 12623 of the 1924 Code, which reads as follows:

"At any time, not less than six months after the appointment of such guardian, the person under guardianship may apply to the court, or any judge thereof, by petition, alleging that he is no longer a proper subject thereof and asking that the guardianship be terminated."

Manifestly, the burden of proof was upon appellant to show "that he is no longer a proper subject thereof" (of the guardianship). See *Waters v. Waters*, 201 Iowa 586.

III. Nevertheless, in determining whether or not he has met that obligation, the findings of the trial court are not necessarily conclusive on appeal; for it is essential to duly recognize the theory of non-adverseness governing actions of this kind. Fundamentally, these proceedings are for the benefit of the ward, rather than antagonistic to him. And this is true whether the particular step taken is nominally by or against the alleged incompetent. Everything in this regard is for his good. If a guardian, through judicial error, is not maintained for appellant's property, no one is harmed but himself, theoretically, at least. *Timonds v. Hunter*, 169 Iowa 598; *Huffman v. Beamer*, 198 Iowa 1113; *Coomes v. Mayer*, 201 Iowa 405. We said, in *Coomes v. Mayer*, supra:

"On the other hand, we recognize that a guardianship proceeding is not adversary. * * * Such proceeding is both prose-

cuted and defended in the interest of the ward alone. We scrutinize a verdict adverse to the ward more closely than we do in a case between litigants whose interests are adversary."

IV. Yet, in contests involving the "termination of a guardianship," it is the policy of this court "to recognize a large discretion in the trial court." *Coomes v. Mayer*, supra. See, also, *Haworth v. Stanley* (Iowa), 200 N. W. 410 (not officially reported).

V. Throughout the controversy, it is to be borne in mind that the real object and purpose of the guardianship is to preserve and conserve the ward's property for his own use, as distinguished from the benefit of others. *Huffman v. Beamer*, supra; *Zander v. Cahow*, 200 Iowa 1258.

VI. Under all circumstances, the criterion is the power and "ability of the owner to manage his property and business affairs in a rational manner." *Zander v. Cahow*, supra; *Graham v. Clapp*, 191 Iowa 1224.

VII. Likewise, in the instant case, the ultimate goal to be reached is appellant's protection, care, and well-being. Conservation of his estate is for that object, and none other. No reason exists for keeping this property for any other person. Perry, the appellant, alone is the man whose welfare is to be promoted. Perhaps this will require the use of the principal, as well as the interest, from this humble estate; and if his needs demand it, all should be utilized. Clearly it appears that this beneficent end cannot be attained by appellant alone, because he has not shown that he possesses the mental capacity to cope with the situation. Rather, the record discloses that the mental deficiency shown at the time the guardian was appointed still continues, and in fact is constantly growing more marked.

After carefully reading the entire record, we are fully convinced that the district court was right. Therefore, its judgment and decree should be, and hereby is, affirmed.—*Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.