W. C. NEIDERMYER, Appellee, v. MARY NEIDERMYER, Appellant.

No. 46832.

APRIL 2, 1946.

REHEARING DENIED JUNE 21, 1946.

Roy E. Havens, of Logan, and Kimball, Peterson, Smith & Peterson, of Council Bluffs, for appellant.

William P. Welch, of Logan, and K. C. Acrea, of Missouri Valley, for appellee.

SMITH, J.—Plaintiff is defendant's son. He filed petition on September 17, 1945, for the appointment of a temporary and permanent guardian of his mother's property under sections 12614, 12620, and 12621, Iowa Code, 1939. Before hearing was held on the prayer for temporary guardianship defendant filed resistance thereto and also filed voluntary application for guardianship under Code section 12617.

Two proceedings were thus inaugurated: one at law, and in a sense adversary, upon plaintiff's petition, requiring notice and hearing (Code sections 12620 and 12621); the other voluntary and in probaté but ex parte (section 12618, Iowa Code, 1939). No formal consolidation was ordered. However, defendant pleaded her voluntary application as a part of her resistance to appointment of temporary guardian and during the hearing on plaintiff's petition (September 27 and 28, 1945) offered it in evidence and asked the court to rule on it. Thereupon the court said:

"My best judgment is that the other case was filed first, and I want it disposed of before I make any ruling in probate, so I will hear you now in the original case at law for the appointment of a guardian."

At the close of the evidence the trial court recited the commencement of both proceedings, expressed doubt as to

whether it could entertain defendant's application when the other proceeding was pending, and ordered the appointment of a temporary guardian based upon a finding "that the defendant, owing to her physical condition" was "physically unfit to transact her ordinary business affairs with discretion." Defendant's voluntary application was then in the same order denied *"because the court has heretofore appointed a temporary guardian."* (Italics supplied.) There was no finding of mental incompetence. Defendant having obtained leave under Rule 332, Iowa Rules of Civil Procedure, appeals from the entire order.

We think the practical result was the same as if a formal consolidation of the two proceedings had been made. The hearing involved considerations pertinent both to the propriety of appointing a temporary guardian and to the matter of appointing a permanent guardian upon defendant's voluntary application.

■ I. We have recently held there is no difference between the powers and duties of a guardian appointed upon the ward's own application and those of one appointed in proceedings instituted by another. Anderson v. Schweitzer, 236 Iowa 765, 20 N. W. 2d 67. The texts of the applicable Code sections are quoted verbatim in that case.

In justice to the trial court and attorneys herein it should be said that opinion had not been announced at the time the instant case was decided. There was until then apparent support for the idea that the voluntary guardianship in some respects differed from the involuntary.

■ II. The doctrine of Anderson v. Schweitzer is important here. Since in both kinds of proceedings guardianship with the same powers and duties is sought there should be no conflict of interest or of jurisdiction. We have referred to the proceeding upon plaintiff's petition as "in a sense" adversary. It is such only in form. There are in fact no adverse interests to be determined. Whether the proceeding be upon the ward's own initiative or upon the petition of another the sole interested party is the one over whose property guardianship is sought. Timonds v. Hunter, 169 Iowa 598, 608, 151 N. W. 961; Huffman v. Beamer, 198 Iowa 1113, 1117, 197 N.

W. 476; Coomes v. Mayer, 201 Iowa 405, 205 N. W. 645; Perry v. Roberts, 206 Iowa 303, 220 N. W. 85. Code section 12617 expressly makes the "best interest of said applicant" paramount in proceedings under it.

It follows that the trial court was in error in assuming that because the proceedings upon plaintiff's petition were first begun and were pending when defendant filed her application the latter must be denied. The first inquiry should have been to determine *in the ward's best interest* whether trial was necessary upon plaintiff's petition; in other words, to determine first whether appointment might not properly be made upon defendant's voluntary application.

 III. Code section 12617 entitles the one petitioning for guardianship over his own property to have a guardian appointed unless he is an idiot or lunatic.

We have pointed out that the trial court here made no finding of mental unsoundness. The appointment of the temporary guardian was expressly based upon defendant's physical unfitness. We need not determine or speculate upon what the legislature meant by the words "idiot" and "lunatic." Even if it intended to exclude from the operation of the section everyone of unsound mind, the court under this record must have found this defendant entitled to its benefits. We think it apparent such would have been the decision if the voluntary proceedings had not been pending.

Defendant was a widow seventy-eight years old. She lived a mile or two north of Missouri Valley, Iowa, at the farm home of her widowed sister, Anna Wehrlie, who was "up in the sixties, or close to seventy" years old. Their brother, Charles Longmier, a widower "seventy some" years old, lived there also. Mrs. Wehrlie's son, Clark Wehrlie, operated the farm but lived in town. The two sisters and their brother lived alone except as Clark occasionally stayed out there overnight.

The only witness who unqualifiedly testified defendant was of unsound mind was her daughter, Ella Leland, who lived in Omaha. Though not a nominal plaintiff Mrs. Leland had agreed in advance to the commencement of the proceedings by her brother.

According to her testimony Clark Wehrlie came down after her when her mother had a stroke in August 1945. She immediately proceeded to care for her mother and to clean up the house generally. In the course of her labors after she had been there over a week she found a box that her father had made for her mother. It was unlocked and contained a lot of money in a white sack: "there was bills, bills and bills." The next day the box was gone and she found Clark Wehrlie had taken it to his house in Missouri Valley. Later, at the insistence of the witness and her nephew, George Gansemer (son of her deceased sister), and upon their threat of sending for the sheriff, the box was put in the bank. She says that at some previous time ("that wasn't so very far back") her mother had forty-four thousand dollars.

The witness detailed a conversation she overheard in which Mrs. Wehrlie said, "Listen, Mary [defendant] is going to give Clark everything." When the witness asked her mother if it was true "that the Wehrlies were going to get her money," her mother answered "Yes, Clark is going to get what she had." When Mrs. Wehrlie ordered the daughter to leave the house defendant made no objection and said, "they don't want you to have what I got."

The witness also said she heard her aunt telephoning the bank that defendant wanted the box brought back: "Mary wants this box back, and if you don't bring this box back she is going crazy"; and she testified her mother heard the telephone conversation and she said she did not want the box left at the bank.

This fairly summarizes the testimony upon which the daughter presumably based her opinion that her mother was of unsound mind. She herself pointed out no particular acts or conduct which she thought indicated unsoundness and she made no comparison of defendant's present with her past conduct or conversations. Proper objection was made to the admission of her opinion testimony and should have been sustained. No sufficient foundation was laid. There was no factual showing inconsistent with sanity.

A nonexpert witness may testify to unsoundness of mind

only after stating sufficient facts to support the conclusion. Campfield v. Rutt, 211 Iowa 1077, 1080, 235 N. W. 59; In re Will of Diver, 214 Iowa 497, 504, 240 N. W. 622; In re Estate of Mott, 200 Iowa 948, 951, 205 N. W. 770. We have even held that if such opinion is based *in part* on matters not so divulged it is not competent. In re Estate of Armstrong, 191 Iowa 1210, 1213, 183 N. W. 386. Of course, such foundation is not necessary to enable a nonexpert witness to testify to *sanity*. It is sufficient for that purpose that he is shown to be qualified by acquaintance and opportunity to observe. In re Estate of Mott, supra, citing cases. Even where the opinion of unsoundness is admitted its value is measured by the strength of the facts upon which it is based. Conway v. Murphy, 135 Iowa 171, 175, 112 N. W. 764.

IV. Other testimony offered by plaintiff was insufficient to prove unsoundness of mind. Defendant's physician was called as a witness. He testified he attended defendant four times during the latter days of August and first days of September 1945 (just preceding the hearing), when she had a cerebral hemorrhage. He had also attended her when she had a similar attack affecting her right side two years earlier.

The most he would say on direct examination was:

"I wouldn't say it was a sound mind. I wouldn't say it was unsound but the mind was affected. * * * Her mind cannot be entirely sound, but I wouldn't say she was insane. I would question as to whether she could transact her business affairs, considering she had had those two hemorrhages of the brain. I would say she cannot transact any complicated business herself under those conditions. There is quite a distinction between insanity and unsoundness of mind. I wouldn't call her insane at all. Her mind is affected, due to this pressure, but it is not an insane mind."

His final word on cross-examination was that defendant's mind was "affected to some extent."

The sheriff who served the notice on defendant testified for plaintiff:

"On the question of whether or not in my opinion Mary Neidermyer was * * * a person of sound or unsound mind, I

wouldn't say she was unsound, she acted very peculiar, I wouldn't say it [her mind] was sound either.''

On the same occasion the sheriff had an order of court to take possession of her box, heretofore referred to, and related how he had to talk her into giving it up. He said she had difficulty in talking because of the paralysis of her throat and that she was excited and nervous. Nothing he related of her conversation and conduct, however, suggests unsoundness of mind. Her reluctance to yield possession of her property was not surprising. Nor was her nervousness under the circumstances any evidence of unsoundness of mind.

Defendant testified in her own behalf. Her testimony displays no indication of mental unsoundness. She confirmed that she had $17,000 in money in the box (the sheriff says he and the banker counted $17,923) and that it was her wish the box be kept in the house instead of at the bank. She said she made Clark ''take the box away to a safe place'' after her daughter found it. She said that her daughter ''hunted high and low'' for the box and that it was later brought back from the bank by her (defendant's) request after her daughter left. She showed clear memory of her children and grandchildren (children of a deceased daughter) and of their residences.

She said on cross-examination that she trusted her son (plaintiff) and her grandson but not her daughter. Her account of the sheriff's visit and demand for possession of the box was not materially different from his own account of it, though she denied his testimony that her brother brought the box in from outdoors. She admitted the execution of a will thereafter but denied having disinherited her children: ''No, I didn't. I want to do the right thing. I am going to do the right thing to my children.'' She said it was the first will she ever made and that no one told her to make it. She explained that what she had in the box was the proceeds of insurance on her husband's life.

An osteopathic physician testified he had known defendant about thirty years and attended her professionally in the three or four weeks preceding the trial: ''every day for the first two weeks and then every other day alternately since

that." He described her physical condition and expressed the opinion she was of sound mind. Concerning her testimony on the hearing, he said:

"I could understand what Mary Neidermyer said here this morning. It is my opinion as a doctor that her conversation was rational. Her reason about the money being as safe in the tin box as it would be in any box [bank] was I think rational; more rational than probably [sic] good judgment."

This witness said that cerebral hemorrhage does not always affect the mind and that in defendant's case only the motor areas were involved.

A neighbor farmer testified who had known defendant "probably forty years," had visited in the Wehrlie home frequently in the last nine or ten years and had visited and talked with defendant four times since her illness that commenced about August 26, 1945. He said her talk was rational and that he would say she was of sound mind. In regard to her preference for keeping her money in the tin box around the house he said her mind was sound but her judgment poor. (It should be pointed out there is no showing when defendant commenced keeping the box at home or that the custom had any relation to her illness.)

The burden of proof was on plaintiff. The presumption of sanity was in defendant's favor and had to be overcome. The courts should and do scrutinize the record more closely in cases of this kind than in ordinary adversary proceedings and doubts will be resolved in favor of the defendant. See Coomes v. Mayer, supra, and Huffman v. Beamer, supra.

We have examined the record with care and think there is no competent evidence to justify further hearing on plaintiff's petition or to indicate that defendant is not entitled to guardianship upon her own application.

V. Plaintiff in argument assumes that a guardianship established under Code section 12617 may be terminated at the will of the ward. We do not so interpret the statutes. This section, with section 12618, was enacted (Acts of the Fortieth General Assembly, chapter 199) as an amendment to that part of section 3219, Iowa Code of 1897, now embodied

in Code section 12614. It was designated as paragraph 4 of what is now section 12614.

What is now included in sections 12623 to 12627, inclusive, was then section 3222, Code of 1897. It provided the *only* method by which the guardianships created under then section 3219 (now 12614) could be judicially terminated. The amendment provided for a new class of guardianships, additional to the three classes enumerated in section 12614, but provided no new or special mode for their judicial termination.

An amended statute is to be interpreted as if it read originally as amended. State ex rel. Iowa State Board of Assessment and Review v. Local Board of Review, 225 Iowa 855, 866, 283 N. W. 87. Applying this rule we must hold that guardianships of the new class can be terminated only as they could have been if their creation had been originally authorized by the statute; that is, in the manner provided by Code sections 12623 to 12627, inclusive. These sections require a determination (after notice and hearing) that the ward "is no longer a proper subject" for guardianship before the guardianship, once established, can be judicially terminated.

VI. Notwithstanding some things said in argument we cannot view this as a contest between expectant heirs and possible testamentary beneficiaries. We assume the original proceeding was brought by plaintiff and his sister in good faith for their mother's best interest. That interest will be fully served by the appointment of a suitable guardian upon her own application. Therefore, no legitimate purpose requires further proceedings to ascertain her mental status. In fact, such further proceedings might be found to be contrary to her best interests.

The district court or judge should appoint a suitable guardian upon defendant's application, and when such guardian is duly qualified should terminate the temporary guardianship and dismiss plaintiff's petition. To that end the case is, therefore, reversed and remanded.—Reversed and remanded.

BLISS, C. J., and GARFIELD, MILLER, MANTZ, MULRONEY, and OLIVER, JJ., concur.

WENNERSTRUM, J., not sitting.