# IN THE COURT OF APPEALS OF IOWA

No. 19-1761
Filed August 5, 2020

**IN THE MATTER OF THE GUARDIANSHIP AND CONSERVATORSHIP OF B.Z,**

**B.Z.,**
 Respondent-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi Wittig, Judge.

A respondent appeals an order appointing her adult daughter as her permanent guardian and conservator. **AFFIRMED.**

Bridget L. Goldbeck of Hughes & Trannel, P.C., Dubuque, for appellant.

James E. Goodman, Jr. and Alyssa M. Carlson of O'Connor & Thomas, P.C., Dubuque, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

The district court found B.Z. in need of a guardian and conservator based on her long-standing psychological issues and her accompanying disregard for her health and financial well-being. Because B.Z. has a history of not appreciating her mental-health condition and because she often places herself in dangerous situations, the court decided she needed more permanent assistance. So the court appointed B.Z.'s daughter, Ashley, as guardian and conservator.

On appeal, B.Z. argues the district court erred in finding she cannot attend to her safety and basic needs. She also claims the court erred in finding her unable to carry out important decisions about her finances. Finally, B.Z. argues the court should have considered whether third-party assistance would meet her needs. Because substantial evidence confirms B.Z.'s diminished ability to care for herself and her financial affairs, we affirm the district court's resolution. We also reject B.Z.'s third-party-assistance argument.

## I. Facts and Prior Proceedings

As the district court remarked, it is not easy for children to watch their parents decline. Parents are to love and care for their children as they grow up. But as parents get older, sometimes it is necessary for the grown children to care for their parents in return. Here, the court approved that role for Ashley, daughter of respondent B.Z.[1]

---

[1] Effective January 1, 2020, Iowa Code section 633.3(37) refers to the person who is alleged to need a guardianship or conservatorship as "respondent" rather than "ward" or "proposed ward." 2019 Iowa Acts ch. 57, § 6. While this legislation was not in effect at the time of the district court's ruling, we find this designation more appropriate and will use it in this opinion.

In 2014, B.Z. lost her job and was evicted from the house she had been renting for eight years in Lawton, near Sioux City. After that, B.Z. found an apartment in Sloan where she lived for two months but left because she "did not like apartment living." B.Z. then began living out of her car. Also during this time, B.Z. repeatedly committed criminal trespass and spent time in jail.

Out of concern for their mother, B.Z.'s sons sought a civil commitment in late April 2014 at Mercy Medical Center in Sioux City. From her first evaluation, B.Z. denied she had mental-health issues, denied she was homeless, and expressed confusion as to why she was brought to the hospital. In addition, B.Z. was uncooperative with treatment and refused oral medications. So her doctors started her on anti-psychotic injections. According to Mercy Medical Center's records, B.Z. was diagnosed with psychosis and mood disorder.

Upon her discharge from Mercy Medical Center, B.Z. moved in with her brother in the farmhouse where they grew up in Nebraska.[2] Ashley testified the conditions at the farmhouse were "deplorable" and, at one point, it did not have heat or electricity. Yet B.Z. lived there for a year and a half before her brother demanded that she leave because of differences in their lifestyles.[3] She cherished her family's farm, but—to her dismay—her brothers sold the land in 2018.[4]

---

[2] B.Z. was discharged from Mercy Medical Center in mid-May 2014. She traveled to the farmhouse but was without food, water, or transportation. Upon her request, B.Z.'s brother returned her to Mercy Medical Center, where she was admitted again six days later. Her doctors expressed significant concerns about her psychological condition, her refusal to believe she had a mental illness, her inability to make financial decisions, and her noncompliance with taking oral medications.

[3] B.Z. testified she paid her brother $200 per month to live there.

[4] Before the property sold, she earned between $2500 and $3000 in rent every six months.

Finding herself without hearth and home for the second time, B.Z. resorted to hitchhiking the highways without a reliable vehicle or access to money. In 2018, Ashley began getting calls from social workers and law enforcement about her mother. They were concerned about B.Z.'s safety and tried to assist her with food and housing, but B.Z. refused. Also around this time, B.Z. voluntarily went to a hospital about one hour outside Norfolk, Nebraska, for physical-health issues. A doctor there called Ashley and asked about her mother's mental health. After Ashley explained B.Z.'s first commitment in Sioux City, the doctors transferred B.Z. to a hospital in Norfolk. The doctors noted B.Z. lacked insight about her condition, appeared unkempt, and had trouble communicating. The hospital released B.Z. with instructions to maintain contact with her doctor for treatment and to keep taking her medications. Again, B.Z. refused to follow the medical advice.

B.Z. was now homeless in Norfolk. Ashley testified that she and her brothers would receive phone calls about their mother trying to find housing and food. B.Z. roamed the streets during the day and slept on porches at night— without permission. This practice led to encounters with the police. By this point, B.Z. realized she was not in a safe physical or financial situation, so she drove to Boone, Iowa, where her son, Aaron, lived.[5] Ashley testified her mother ran out of gas several times on her way to Boone and asked strangers for help. After a brief visit with Aaron, B.Z. drove to Ankeny to see if her other son, Austin, would give her money. B.Z. testified that he did not welcome her inside so she slept in the SUV on his driveway.

---

[5] B.Z. managed to acquire an SUV, though it was not registered nor was it insured.

Striking out with her sons, B.Z. turned to her daughter Ashley, despite being out of contact with her for a few years. She drove to Ashley's home in Dubuque, but Ashley was away. B.Z. elected to wait in her car for a few hours in the extreme, late July heat until Ashley returned. When Ashley arrived, her mother appeared confused and struggled to communicate why she was in her daughter's driveway. Ashley took B.Z. to the emergency room. The staff recommended B.Z. stay at a crisis housing shelter. The next day, Ashley discovered her mother left the shelter during the night and was now on her porch.

After this chain of events, Ashley, Aaron, and Austin decided their mother needed assistance again. Ashley sought an involuntarily commitment for her mother at Mercy Hospital in Dubuque. During B.Z.'s commitment, social workers and doctors recommended that Ashley become her mother's guardian and conservator to better assist her. Ashley tried instead to see if B.Z. could function with extensive family support. Mercy Hospital's doctors diagnosed B.Z. with schizophrenia and prescribed anti-psychotic medication. While placed at a care facility, her condition improved on the medication. B.Z. was then transferred to a residential living facility where she had more independence and responsibilities such as paying rent. By this time, the doctors changed her diagnosis to a mood disorder and took her off the anti-psychotic medication because she was reportedly experiencing side effects like muscle stiffness.

Through the rest of 2018 until early 2019, B.Z. stabilized, according to Ashley. Unfortunately, B.Z.'s progress soon unraveled, and she slipped back into problematic behaviors and thought processes. B.Z. could not recognize the severity of her mental-health concerns, and she displayed poor decision making.

Once, she left the residential living facility without telling anyone and eventually returned confused. Her doctor recommended she get back on medication, but B.Z. refused. Another time, she withdrew $10,000 and carried it as she walked around Dubuque. After a while, B.Z. called Ashley confused and could not explain what happened.

B.Z.'s condition deteriorated, and her health care providers instructed her to resume her anti-psychotic medication. Again, she refused. Worried about her mother, Ashley launched a third involuntary commitment proceeding. The court found B.Z. was seriously mentally impaired and lacked the insight to maintain treatment. B.Z. was hospitalized again at Mercy Hospital in Dubuque. The doctor there recommended Ashley seek guardianship and conservatorship for her mother. Eventually, B.Z. moved to a residential care facility where she resumed her medications and, according to Ashley, became more communicative and clearer-minded.

In June 2019, Ashley petitioned the court for guardianship and conservatorship for her mother. She attached a letter from B.Z.'s doctor that stated:

> [B.Z.] has chronic schizophrenia and a long-standing history of treatment non-compliance and poor insight. She does not have insight into the severity of her condition or the need for her to have longitudinal treatment and medications. I believe that it would be in her best interests in the long-term to have a guardian for her medical care to make safe decisions on her behalf that will maximize her likelihood of remaining well over time.

A month later, the court appointed Ashley as B.Z.'s temporary guardian and conservator. In September 2019, the court heard testimony from Ashley and B.Z.

Soon after, the court appointed Ashley as her mother's guardian and conservator. B.Z. appeals.

## II. Scope and Standard of Review

"Actions for the appointment of a guardian or conservator are triable at law." *In re Conservatorship of Leonard*, 563 N.W.2d 193, 194 (Iowa 1997) (citations omitted). Thus, we review for the correction of legal error. *Id.* at 195; *see* Iowa R. App. P. 6.907. "Because our review is for errors at law, we affirm only if there is substantial evidence to support the district court's findings." *Leonard*, 563 N.W.2d at 195; Iowa R. App. P. 6.904(3)(a). "Evidence is substantial if a reasonable person 'would accept it as adequate to reach the same findings.'" *In re Guardianship of Feistner*, No. 17-2108, 2018 WL 4913669, at *1 (Iowa Ct. App. Oct. 10, 2018) (quoting *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 693 (Iowa Ct. App. 1991)).

## III. Analysis

A petitioner must prove the guardianship and conservatorship are necessary and must do so by clear and convincing evidence. *Id.* (citing Iowa Code section 633.551(1), (2)). That standard means there is no serious or substantial doubt about the correctness of a particular conclusion the court draws from the evidence. *Id.*

### A.  Guardianship

We first address whether Ashley proved the grounds necessary to establish an involuntary guardianship. We begin with the presumption the proposed respondent is competent. *In re Guardianship of R.H.*, No. 19-0007, 2019 WL 4297878, at *1 (Iowa Ct. App. Sept. 11, 2019) (citing *Neidermyer v. Neidermyer*,

22 N.W.2d 346, 350 (Iowa 1946)). Ashley then must prove by clear and convincing evidence that B.Z.'s decision-making capacity was so impaired that she was unable to care for her personal safety, or to provide for necessities such as food, shelter, clothing, or medical care without which physical injury or illness may occur. *See* Iowa Code § 633.552(2)(a) (2019).

The record shows B.Z. has chronic schizophrenia, which requires a continuous regimen of anti-psychotic medication. But B.Z.—from her first involuntary commitment until her testimony at trial—denied she had a mental illness.[6] Relatedly, B.Z. has a long history of refusing medication both because she did not believe she needed it and because of its side effects such as muscle stiffness. As her doctors and her children have recognized, B.Z. is unable to appreciate the magnitude of her diagnosis. That B.Z. cannot appreciate the existence and seriousness of her mental illness—after several family interventions, commitments, and treatments—shows her capacity for decision making is severely impaired.

Beyond the medication issues, her history of homelessness reveals an inability to effectively care for herself and to provide for basic necessities like food and shelter. Since losing her job in 2014, B.Z. has found herself homeless at least three times across two states. Each time, she wandered the streets and slept in her car or on nearby porches—asking for food and money anywhere she could.

---

[6] During trial, B.Z. was asked if she knew why the court in June 2019 found she had schizophrenia. B.Z. responded, "I wasn't paranoid; I wasn't hearing voices; I was upset. I get a little eccentric . . . when I'm upset, I do. That's [B.Z.]. I've been [B.Z.] for as long as I can remember. I might do some silly things . . . I might look a little eccentric, but I'm [B.Z.]."

These decisions led to trespass charges and concerned the communities where she found herself. Sometimes she would drive away from the situation but ran out of gas and money—stranded and at the mercy of strangers. This pattern of risky choices supports the court's appointment of a guardian.

True, B.Z. is physically capable of many everyday tasks. *See Feistner*, 2018 WL 4913669, at *2 (noting ability to perform daily living activities as a factor). But she also has a diminished capacity for sound decision making. This is a dangerous combination because B.Z. can walk into an unsafe situation without realizing its risk or how she got there. While B.Z. has never reported suicidal thoughts, it is inescapable that—as the district court stated—"[s]he has experienced many different episodes that place her in danger." *See id.* (noting absence of thoughts of "suicidal ideation or self-harm" as a factor). These episodes result from a severely diminished capacity for decision making. The record includes substantial evidence that B.Z. cannot provide for her own care and safety. Thus, we agree with the district court that B.Z. needs a guardian.

### B. Conservatorship

Next, we address whether Ashley proved the grounds necessary to establish an involuntary conservatorship. Ashley must prove by clear and convincing evidence that B.Z.'s decision-making capacity was so impaired that she was unable to make, communicate, or carry out important decisions about her financial affairs. *See* Iowa Code § 633.566(2)(a).

Without dispute, B.Z. has overseen her finances in the past. For instance, B.Z. paid her rent for eight years before facing eviction. She also paid rent to her brother at the farmhouse in Nebraska and to the residential living facility in

Dubuque. She has an awareness—albeit limited—of her debts and has considered the need to manage them. As for her homelessness and panhandling, B.Z. insists irresponsible money management is not enough to show the need for a conservatorship. *See In re Guardianship & Conservatorship of Teeter*, 537 N.W.2d 808, 810 (Iowa Ct. App. 1995) ("The fact Shirley may spend money foolishly or give money to a child is not in itself sufficient to find she is not competent."). B.Z. also plays down her decision to withdraw $10,000 and carry it unsecured around the city.

Contrary to B.Z.'s contentions, her fiscal welfare is not the equivalent of "irresponsible spending." Rather, the record reveals her impaired capacity to make important decisions about her financial affairs. Case in point, in May 2014, during her second stay at Mercy Medical Center in Sioux City, B.Z.'s doctors recommended her "daughter or family petition for protective payee as [B.Z.] is unable to manage money appropriately." They explained B.Z. was unable to make monetary decisions "appropriate for her safety." Finally, her doctors "strongly recommend[ed] that she apply for disability as her mental illness renders her incapable of working and providing for herself."

Without that protection, B.Z. accumulated significant debt in medical bills, around $36,000, by the time of trial. She was accepted for social security disability, which could have offset those expenses, but she denied the benefit or failed to fill out the paperwork. Eventually, the Social Security Administration office called Ashley to take care of her mother's financial affairs.

While B.Z. knows of her debts and has made financial decisions in the past, those facts do not erase the need for a conservatorship. The record provides

substantial evidence that she cannot carry out important decisions about her financial affairs.

## C.     Third-party assistance

Lastly, in proceedings to establish a guardianship or conservatorship, "the court shall consider credible evidence from any source to the effect of third-party assistance in meeting the needs of the" respondent.  Iowa Code § 633.551(4); *see In re Guardianship of Hedin*, 528 N.W.2d 567, 579 (Iowa 1995) ("[T]he court must consider the availability of third-party assistance to meet a [respondent's] need . . . if credible evidence of such assistance is adduced from any source.").  But neither party has the burden to produce such evidence.  *Id.*

No credible evidence on the availability of third-party assistance could have been adduced from this record, nor did either party produce such evidence.  The district court did not have to consider what was not there.

**AFFIRMED.**