NEW YORK LIFE INSURANCE COMPANY, Appellant, v. W. J. BURBANK, Treasurer of State, Appellee.

No. 38082.

DECEMBER 17, 1927.

REHEARING DENIED NOVEMBER 22, 1929.

*Carr, Cox, Evans & Riley,* for appellant.

*John Fletcher,* Attorney-general, *Maxwell A. O'Brien,* Assistant Attorney-general, and *Ben J. Gibson,* for appellee.

MORLING, J.—As a preliminary statement in general terms of the question submitted, it may be said to be: Should the term "gross amount of premiums received by it * * * for business done in this state," in Section 1333, Code  Supplement, 1913, requiring insurance companies of plaintiff's class to pay a tax of 2½ per cent thereon, be construed to mean the total amount of premiums computed at table or policy rates at their face, or should it be construed to mean that amount less such sums as the company has during the year abated from premiums or paid in cash to policyholders for dividends and surrender values? It was stipulated that plaintiff is a mutual life insurance company, organized under the laws of New York, having no corporate stock, and conducting its business on the mutual plan only; "that its business is conducted on a level premium plan,—that is to say, that the only premium required * * * is collected in advance, and is calculated on such basis it will not have to be increased during the life of the policy. The established or calculated premium is made up of two factors: First, the net mathematical premium which, invested at an assumed rate of interest, will provide sufficient funds to meet the obligations of the respective policies, not including any dividends. To this factor is added a factor known as 'loading,' which is to provide for unforeseen contingencies, excess mortality, taxes, and operating expenses. That neither the policy contract nor charter contain any direction that the board of di-

rectors shall declare dividends, and, so far as the individual policyholder is concerned, he has no control over the question whether or not dividends shall be declared, but when declared, has a right, under his contract, to have them distributed in accordance with the policy contract. Under the mutual plan, whenever, by reason of excess interest earnings, savings in expenses, or savings in mortality, or any other source of profit, a surplus is earned, it is held for the benefit of all the policyholders, and may be assigned by those vested with authority so to do, and distributed in whole or in part to the policyholders. This distribution, when and if made, is commonly called dividends to policyholders, and is paid or credited to the policyholder in accordance with the provisions in the policy contracts.''

By plaintiff's charter, its officers are required, as soon as practicable after the 31st day of December of each year, to cause a statement of its affairs to be made up, and to ''ascertain the surplus earned by it during said year, which said ascertainment of surplus shall be binding and conclusive upon every person entitled to share in its surplus.'' By the terms of plaintiff's policies, the proportion of divisible surplus accruing to them shall be ascertained annually, and, beginning at the end of the second year, such surplus as shall have been apportioned by the company to the policy shall, at the option of the insured, be either paid in cash or applied toward payment of premiums or left to accumulate at interest, credited annually, and either withdrawable in cash at any time or at a specified time, as provided in the contract.

At the table or contract rates, the amount of premiums collected by plaintiff on its Iowa business in 1920 was $1,611,198.64. Included in this sum were the following items which the plaintiff claims should have been deducted in ascertaining the sum upon which it was required to pay the 2½ per cent tax: 1. Annual dividends actually paid in cash, $10,354.21. 2. Dividends used by way of deduction from the stipulated premiums, $104,-628.59. 3. Deferred dividends paid in cash, $216,221.48. 4. Amounts paid to policyholders in cash on surrender of policies, $245,894.68. These sums were allowed or paid to Iowa policyholders, and plaintiff seeks to recover the amount of the tax paid upon them.

Plaintiff's contention is that it conducts its business on the

principle of carrying insurance at cost; that it is the duty of its officers to ascertain yearly the company's condition, determine the excess of income, and assign for distribution to policyholders "such portion of its surplus as they may deem consistent with conservative business management;" that, "after the action by the board of directors in assigning the surplus for distribution to policyholders, the company is not entitled to retain any part of it as its own absolute property, and therefore comes within the application of the principle announced in" *In re Continental Cas. Co.*, 189 Iowa 933, which will be later referred to.

Is it correct to say that the dividend is merely a return of a part of the premium which the company has no right to retain as its own absolute property? Attention to the facts of this case, as stipulated and proved, and to the statutes, will distinguish it from the cases relied upon by plaintiff.

While the plaintiff is a mutual company, and is owned by its policyholders, rather than by stockholders, it is, nevertheless, a corporate entity, as distinct from its policyholders as is the stock company from its stockholders. The plaintiff's policyholders sustain a double relationship to it: (1) That of contractors with it, and (2), resulting therefrom, that of *pro tempore* owners of it. They are owners only in a qualified sense. They change from day to day, not by a mere transfer of interests which persist in others, but by utter cancellation of the interests of some and the acquirement by new contracts of newly created and temporary interests by others. The policyholder whose connection with the company expires by lapse, surrender, or death has no interest which he may transmit in the continued existence of the company. The policyholders have no interest in the permanent surplus, other than in the gains from the investment thereof and as an assurance of the safety of their contracts. In the case of the stock company, the stock is owned by the holders in a different capacity than as policyholders, though the same person may be interested in both capacities. The stock investment constitutes a source of financial strength and safety which the mutual company does not have, but which, manifestly, sound business principles would dictate that it offset by the collection of larger premiums, used in part in the accumulation of a larger reserve and surplus. (See Chapter 429, Acts of the Thirty-seventh General Assembly, and cases post.) The surplus of today results

in large measure from the premiums collected from policyholders who have long ceased to be such. The earnings from their contributions figure largely in current dividends. Whether the business is conducted by a stock company or a mutual company, it is operated upon the same general principles. The so-called earnings, profits, or gains are of exactly the same nature, derived from the same sources. The factors entering into the fixing of the premium are: First, mortality, computed according to experience; second, interest earnings, computed at a rate estimated from experience; third, "loading," to provide for operating expenses and unforeseen contingencies. The premium is fixed, not for the individual, but for a class, and the experience upon which it is based is the experience of a series of years. There have been in the past, and it must be assumed that there will be in the future, fluctuations in each element entering into the premium basis. The duty of paying the premium in order to continue the insurance is necessarily that of the policyholder to the company, as an entity distinct from him, and is absolute. The premium is a resource of the company's. The right to the dividend depends on the discretion of the plaintiff's officers. As stipulated, "he has no control over the question whether or not dividends shall be declared." The annual or divisible surplus, as ascertained, arises, according to the evidence, "from various sources, such as excess interest earnings, savings in mortality, savings in expense charges, perhaps gains from lapsed and surrendered policies, and other profits which may arise in the conduct of the business." Manifestly, the interest earnings are those of the invested funds (capital) derived from premiums paid by former and by existing policyholders,—the capital (though not capital stock investment) of the corporation. The gains from lapsed and surrendered policies are gains of the company to which the persisting policyholders have not contributed, but in which they participate. It is a matter of general knowledge, shown by official reports, that some stock companies issue participating policies, and some mutual companies issue non-participating policies. The gains from non-participating policies would become a part of the gains of the corporation in which the participating policyholders of a mutual company would share. As has been seen, the officers may not be compelled to declare dividends. The policyholder has nothing to say as to

whether or not they shall be declared, or as to the amount thereof. He merely has the right to have the dividend distributed according to the contract, if one is declared. Until or unless it is declared, he has no right to dividend. It is not merely a return which the company is obligated to make of his money. The company is not so obligated. The assured's obligation is to pay the premium, if he desires to continue the policy. The company's obligation is to pay the dividend, if apportioned. The only evidence in support of the claim that the insurance is to be carried at cost is that of a witness who says:

"The presumed aim of a mutual company is to carry insurance for the policyholders at cost. * * * Q. Then, in other words, isn't it true that what is distributed in dividends to the policyholders is the difference between the actual cost of carrying the insurance and the estimated cost of it at the time the premiums are originally computed and established? A. That is presumably the aim of the dividend schedules."

He further says:

"The dividends declared by the New York Life Insurance Company do not represent the actual earnings over and above the assumed cost of the insurance. * * * They do not declare all their earnings in dividends, but a portion thereof, and assign the remainder to surplus."

The policyholder pays to the company a sum believed to be in excess of what will be the so-called actual cost. In actual practice, it is believed that the assured is not only purchasing protection, but making an investment. This is particularly illustrated by the old forms of tontine and semi-tontine policies, and by (at least some) deferred dividend contracts. It is expected that this margin, as well as the proportion assigned for reserve, will be invested at a profit.

"But in level-premium life insurance, while the motive for taking it may be mainly protection, the business is largely that of savings investment. The premium is in the nature of a savings deposit. Except where there are stockholders, the savings bank pays back to the depositor his deposit, with the interest earned, less the necessary expense of management. The insur-

ance company does the same, the difference being merely that the savings bank undertakes to repay to each individual depositor the whole of his deposit, with interest, while the life insurance company undertakes to pay to each member of a class the average amount (regarding the chances of life and death); so that those who do not reach the average age get more than they have deposited,—that is, paid in premiums (including interest),—and those who exceed the average age less than they deposited (including interest)." *Penn Mut. Life Ins. Co. v. Lederer*, 252 U. S. 523, 531 (64 L. Ed. 698, 702).

As has been shown, some of the premium finds its way into the permanent surplus of the company. The margin of earnings above the estimated amount and the saving in mortality rate and "loading," in the case of a stock company, are undeniably profit, and from it the dividends are paid to the stockholders, and in the case of participating policies, to the policyholders. In the case of the plaintiff, that same margin, acquired in the same manner and from the same sources, is divided between the permanent surplus belonging to the company and the policyholders. In both cases, it represents profit. In both cases, the contract obligation on the part of the policyholder (if he continues the insurance) is to pay the premium in full, and on the part of the company to pay or allow the dividend in full, in the event that one is assigned. If the dividend is used in reduction of premium, it is, in substance, the offsetting by the policyholder against the premium of his demand against the company.

The quest is for the legislative purpose. By Section 807 of the Code of 1873, every insurance company doing business in the state was required to pay "as taxes, two and one-half per  cent of the gross amount of premiums received in this state during the preceding year." The evidence is that, since 1872, the administrative officers of the state have construed the law as requiring the computation of the tax on the gross premiums received, computed at the contract rates, without any deductions for dividends or surrender values. Plaintiff, as well as the other companies, has been paying the tax accordingly during all these years, without demur. A settled practice under which the state has collected and the companies have paid such

important amounts for so long a time ought not to be disturbed without compelling reasons therefor. Executive construction should be given much weight. *Bankers' Mut. Cas. Co. v. First Nat. Bank,* 131 Iowa 456; *Burk-Waggoner Oil Assn. v. Hopkins,* 296 Fed. 492, and cases cited. The statute was re-enacted in the Code of 1897, Section 1333. It is a fair presumption that the legislature, by the re-enactment without change of language, was satisfied with such construction, and intended that it should continue. *Komada & Co. v. United States,* 215 U. S. 392. But whatever might have been the meaning of the law before the enactment of Chapter 43, Acts of the Twenty-eighth General Assembly, we think that the legislative purpose from that date is thereby clearly manifested. That act revised Section 1333 by letting it stand as to foreign companies, and taking out and making substitute for the provisions for domestic companies. Section 5 required that domestic companies, with certain exceptions, should pay the "equivalent to one per centum of the gross receipts from premiums, assessments, fees and promissory obligations required by insurance contracts * * * after deducting the amounts actually paid for losses, matured endowments, dividends to policyholders and the increase in the amount of the reserve as certified * * * and the amounts returned to members upon canceled policies, certificates and rejected applications, during said year * * *."

By this enactment the legislature designated the companies which it would permit to make deductions, and the deductions that they might make. *Penn Mut. Life Ins. Co. v. Lederer,* 252 U. S. 523. The thirty-seventh general assembly again had before it the matter of deductions, and by Section 20, Chapter 429, Acts of the Thirty-seventh General Assembly, provided that the gross receipts of mutual fire or casualty companies "shall consist of the gross premiums or receipts for direct insurance, without including or deducting any amounts received or paid for reinsurance, but with such other deductions as provided by law, and in addition deducting any so-called dividend or return of savings or gains to policyholders * * *."

We need not, in this connection, discuss Chapters 56 and 57, Acts of the Thirty-second General Assembly, referred to in *In re Continental Cas. Co.,* 189 Iowa 933, post. The amended statute is to be construed as if it were a new and independent act. *Mc-*

*Guire v. Chicago, B. & Q. R. Co.*, 131 Iowa 340; 36 Cyc. 1165. The amendment may be regarded also as placing a construction upon the former statute which, as to the future, is controlling of the legislative intent. *Aikin v. Western R. Corp.*, 20 N. Y. 370, 373; 36 Cyc. 1142.

The claim that the dividend is a refund of that part of the premium which the company has no right to retain as its own, and that not the contract premium, but the contract premium less dividends declared, is the gross premium, within the meaning of the statute, is, as to foreign companies, we think, on the facts before us, untenable. Much more so, is the contention that deferred dividends and surrender values paid are part of the premiums deductible in ascertaining the gross premiums received. Our conclusion is sustained by the following cases: *Northwestern Mut. Life Ins. Co. v. Roberts*, 177 Cal. 540 (171 Pac. 313); *Cochrane v. National Life Ins. Co.*, 77 Colo. 243 (235 Pac. 569); *New York Life Ins. Co. v. Wright*, 31 Ga. App. 713 (122 S. E. 706); *State ex rel. Northwestern M. L. Ins. Co. v. Tomlinson*, 99 Ohio St. 233 (124 N. E. 220); *State ex rel. Hdw. Mut. Cas. Co. v. Hyde*, 304 Mo. 447 (264 S. W. 381); *Massachusetts Bond. & Ins. Co. v. Chorn*, 274 Mo. 15 (201 S. W. 1122); *Fire Assn. v. Love*, 101 Tex. 376 (108 S. W. 158).

The authorities thought to be in opposition to our conclusion involve, we think, materially different states of fact, or different statutory terminology. *Metropolitan Life Ins. Co. v. State*, 194 Ind. 657 (144 N. E. 420); *Mutual Ben. Life Ins. Co. v. Herold*, 198 Fed. 199; *Mutual Ben. Life Ins. Co. v. Commonwealth*, 128 Ky. 174 (107 S. W. 802); *Mutual Ben. Life Ins. Co. v. Richardson*, 192 Cal. 369 (219 Pac. 1003); *Commonwealth v. Penn Mut. Life Ins. Co.*, 252 Pa. St. 512 (97 Atl. 677).

Plaintiff relies on *In re Continental Cas. Co.*, 189 Iowa 933. The claims in that case were by a casualty company for a deduction for premiums returned on cancellation of fire insurance policies, and by the casualty company and fire insurance companies for deductions for premiums paid for reinsurance on identically the same risks granted pursuant to contract made and carried out in another state. The reinsurance was held not to be business done in Iowa. The state was claiming a double tax upon the same premium. That phase of the decision is not in point here. The state in the casualty company case relied also

on Chapter 56, Acts of the Thirty-second General Assembly; but Chapter 43, Acts of the Twenty-eighth General Assembly, Chapter 429, Acts of the Thirty-seventh General Assembly, the history of Section 1333, Code of 1897, and the administrative construction placed upon it, were not brought to the attention of the court. The deduction claimed was for the unearned part of the premiums returned to the individual policyholders on cancellation, not for earnings or savings apportioned as dividends or surrender values. While the discussion in some particulars is inconsistent with our discussion here, the case is not authority in support of plaintiff's present contention. Whether, in the light of the facts and legislative history now reviewed, we would now arrive at the same conclusion, need not be considered.

It is urged that to so construe the statute would render it inimical to the equal protection clause of the Fourteenth Amendment, Constitution of the United States, inasmuch as domestic companies are permitted by the statute to make  deductions. See *Hanover Fire Ins. Co. v. Harding*, 272 U. S. 494 (71 L. Ed. 372); *Western Union Tel. Co. v. State ex rel. Coleman*, 216 U. S. 1 (54 L. Ed. 355), and cases cited. The plaintiff by its action is seeking an affirmative recovery, and bases its claim upon Section 1333, Code of 1897, not as an invalid statute, but as a valid one, having the meaning contended for. Plaintiff does not, by its pleading or otherwise, directly attack the statute as unconstitutional, nor the construction which the taxing officers were and are placing upon it as rendering it unconstitutional. Constitutional questions ought ordinarily not to be considered except when necessarily involved, and then upon the fullest investigation and argument. *Iowa Mot. Veh. Assn. v. Board of R. Commrs.*, 202 Iowa 85. It is true that, if a statute is fairly open to two constructions, one of which will render it constitutional, and the other of doubtful constitutionality, or unconstitutional, the construction upon which it may be upheld should be adopted; but it is not the province of the court to amend the law in order to save its constitutionality,—to give to it a meaning which the legislature did not intend. *Yu Cong Eng v. Trinidad*, 271 U. S. 500 (70 L. Ed. 1059).—*Affirmed.*

STEVENS, FAVILLE, ALBERT, KINDIG, and WAGNER, JJ., concur.

DE GRAFF, J., concurs specially.

EVANS, C. J., not participating.

DE GRAFF, J. (concurring specially). This case involves the taxation of a mutual life insurance company organized under the laws of a sister state and authorized to transact its business in Iowa. No constitutional question confronts us in making this decision. In paying the taxes required of it by Section 1333, Supplement to the Code, 1913, it claims that certain deductions should be permitted from the "gross amount of premiums received by it" for business done by it in Iowa, including in such business done in this state, "all insurance upon property situated in this state and upon the lives of persons resident in this state." It is obvious that the legislature intended that such tax should be levied upon the premiums collected by an insurance company for insurance on property or lives of persons situated in the state, whether the actual contract for such insurance was made within or without the state. The said section also provides:

"No deduction or exemption from the taxes herein provided [being 2½ per cent of the gross amount of premiums received for such insurance] shall be allowed for or on account of any indebtedness owing by any such insurance company."

The amendment to said Section 1333 by the thirty-second general assembly refers to fire insurance companies, and therefore does not directly affect life insurance companies.

We must first consider the meaning of the phrase "gross amount of premiums received," as used in said section. It is not believed that the legislature intended to use any "technical" words or "trade terms" when it selected the words contained in the phrase, but used words the meaning of which is known to laymen, and not to experts and "technicians" only. Therefore, the word "gross" is synonymous with "whole," "main bulk," "whole taken together," and "amount" is a synonym of "whole sum," or "sum total." It is obvious that the word "premiums" was intended to mean "payment made for insurance." Therefore, we then have—reconstructed—this phrase, "whole sum

total of the payments made for insurance.'' And it is of this that 2½ per cent taxes are to be paid.

It will be noticed that the legislature *did not* use this term, ''two and one-half per cent of the amount of gross premiums received by it;'' therefore the word ''gross,'' as used in the section, applied to the word ''amount,'' and not to the word ''premiums;'' so it is the ''sum total of the premiums received'' upon which the tax must be levied.

It does not seem necessary to interpret the meaning of the words ''gross'' and ''premiums,'' as technically used in the insurance business, nor inject such technical words as ''net,'' ''premium deductions,'' etc.; because, as said before, the legislature evidently did not intend to create any uncertainty in the law.

The exact meaning of the words ''premiums received'' has been clearly defined by this court in the case of *In re Continental Cas. Co., 189* Iowa 933, as ''those premiums which the company has a right to retain;'' so, again reconstructing our phrase, we then have, ''the sum total of the premiums which a company has a right to retain,'' and thereupon the tax of 2½ per cent is to be levied.

The premium which a company has the right to retain is the payment for the insurance given under the contract of insurance, and is fully set out in the contract, and designated therein as ''the premium.'' But the statutes say, in the case of insurance *other than life insurance,* that a policy of insurance may be surrendered by the holder thereof, the insurance ceasing thereupon, and the ''short term,'' or ''unearned premium,'' as the case may be, be recovered from the company. This obviously does not apply to life insurance, by reason of the very nature of the contract of insurance. Unearned premiums are not known in life insurance, and upon surrender of a policy by its holder, any sum paid thereupon by the company is not an unearned premium, in any sense. The surrender value allowed by the company is based *upon the self-insurance fund* built up by the policyholder himself in the payments he makes to the company. In *other than life insurance* there is no such ''self-insurance fund'' built up by the policyholder. So the return of a part or all of the ''unearned premium'' to the holder of a policy of insurance other than life, upon the surrender or cancellation of the insurance,

must not be confused with the "surrender value" paid to a life-insurance policyholder upon surrender of his contract. One, the former, is but the return of a part of a premium for insurance *not to be carried out for the full term for which the premium was to pay*; the latter is the "buying back" from the policyholder of the insurance which he has already paid for. It is on account of this difference that the rule in the *Continental Cas. Co.* case cannot be taken to apply to surrender values returned to policyholders upon cancellation of their contracts, and therefore such surrender values cannot be permitted as a deduction from the premiums which a company has a right to retain, in arriving at the gross amount upon which the tax is to be calculated.

There is no question whatever that a life insurance company has the right to retain the premium set out in its contract. No "short term" or "unearned premium" rule can apply, by reason of the nature of the insurance granted in such contract. Hence, the tax is to be levied upon the whole amount of premiums received by the company.

But, again, it is said that the dividends declared by the company or paid by the mutual company to its policyholders may be used in part payment of the premium, and therefore they should be allowed as a deduction from the premiums in arriving at the total or gross amount received, upon which the tax is to be levied.

Let us consider again that the legislature did not assume to have any so-called "technical training" in the insurance business, and especially in life insurance, but it had the common knowledge that a "premium" was the payment for life insurance or any other kind of insurance, and it also knew that such premium did not represent exclusively "the cost of insurance." If it had wanted to base the tax on the "cost of insurance," it would have used that term. It is of common knowledge that in the scheme of insurance, whether carried on by a capital stock or a mutual insurance company, that there is a margin, or "so-called profit." In the stock company this margin or "profit" becomes the property of the stockholders of the company. In a mutual corporation this margin or "profit" becomes the property of the mutual organization. In either case, such margin or "profit" may be disbursed to the owners of the corporation in the way of dividends. When in a mutual company, such dividends are de-

clared or paid to the policyholders. Then, by one reasoning, such dividend reduces the cost of their insurance, but it does not reduce the *"premium"* called for in their policies; and it is upon those premiums that the tax is to be levied.

Section 1333 says:

"No deduction or exemption from the taxes * * * shall be allowed for or on account of any indebtedness owing by any such insurance company * * *."

When a dividend is declared to a policyholder by a mutual company, then that becomes a debt owing by such company to the policyholder, and until paid, remains a debt. If a policyholder uses that debt as part payment of the premium he is called upon to pay on account of his insurance, it in no way reduces the *premium*; it only reduces the amount of cash he must pay on that premium. The company receives and retains the same amount of that premium as it would, were there no dividend connected with the transaction.

A mere bookkeeping device cannot be accepted as a means to thwart legislative intent. The withholding of a dividend from a policyholder until he pays the balance necessary to make up the full *premium* is, in effect, no different than when the dividend check is sent to the policyholder, and he then returns it as a part of the cash payment on the premium. In either case, the company receives and retains the full amount of the *premium*, although it is true that the *cost of insurance* is reduced to the policyholder. The policyholder is entitled to the declared dividend, whether or not he pays the next year's premium on the policy. As said before, the legislature did not deal with *"cost of insurance;"* it dealt with *premiums* solely. Therefore, the dividends declared to policyholders of a mutual life insurance company are not allowed as a deduction from the gross amount of premiums received in calculating the tax to be paid on such premiums.

The rule established in the *Continental Cas. Co.* case cannot control in the case at bar. It is not *stare decisis* here. It is good law for that case. In that case, the unearned premiums returned to policyholders upon termination of contracts before the time such contracts were originally intended to run, for which time

the premium was charged thereupon, were rightfully held as being deductible, as the company, by statutory mandate, was *not entitled to retain the full premium*. In the case at bar, the company is entitled to retain *all premiums called for in its contracts*. If its contracts are terminated before the time they are intended to run, the payment of a surrender value thereon is not a return of any unearned part of any premium, but is the cashing of the value of the self-insurance fund which the policyholder has built up by his premium payments.

As Section 1333 deals with gross amount of premiums, which has been construed by this court to mean gross amount of premiums which the company had a right to retain, then, as the mutual life insurance company had the right to retain all of the premiums, there can be no deduction of the surrender values paid on termination of policies or of the dividends which have been declared by the company to policyholders.