STATE OF IOWA ex rel. IOWA STATE BOARD OF ASSESSMENT AND REVIEW, Plaintiff, Appellant, v. LOCAL BOARD OF REVIEW OF DES MOINES et al., Defendants, Appellees, C. S. MISSILDINE et al, Interveners, Appellees.

No. 44411.

856 

DECEMBER 30, 1938.

REHEARING DENIED APRIL 7, 1939.

John H. Mitchell, Attorney General, Charles Bookin, Asst. Attorney General, Carl A. Burkman, County Attorney, and D. M. Kelleher, for appellant.

C. I. McNutt, for defendants, appellees, and for interveners, appellees, Joe Cordaro, C. C. Cook and Mazie Cook.

John Connolly, Jr., for interveners, appellees, W. B. Lawler, Elizabeth Lawler, A. A. Anderson, and Nellie Anderson.

H. Pierce Witmer, for intervener, appellee, C. S. Missildine.

E. D. Perry, for intervener, appellee, Guy A. Miller.

KINTZINGER, J.—For their own convenience in facilitating the listing of property for taxation in the city of Des Moines, the local taxing officials divided the city into zones or so-called taxing districts. The land values in such various zones or districts were appraised separately from the improvements thereon. Measurements of the cubical contents of the improvements or buildings thereon were made and classified according to type. There was no appraisal of individual residences or business structures as separate items, but all structures were valued according to certain unit costs based upon reproduction minus depreciation.

The ground or lot values minus the improvements were then added to the unit estimated costs of said improvements, minus depreciation. The valuation so determined was entered on the assessment rolls and then arbitrarily discounted from two to fifty per cent, the discount not being based upon the physical condition of the improvements but according to location. The local board of review approved the plan of the assessor and ordered further discounts from $2\frac{1}{2}$ to 10 per cent.

About 7,000 taxpayers of the city of Des Moines appeared before the local board of equalization, filed objections to their assessments, and when relief was denied, about 2,000 taxpayers appealed to the district court of Polk county. About 1,100 of these appeals have been disposed of.

As an illustration of the unjust methods of assessments made in various districts of the subdistricts in the city of Des Moines, we quote from the testimony of C. A. Crosser, secretary of the bureau of municipal research. He testified that he made a study of the 1937 assessment during its progress and that before the assessment was made he and the city assessor attended neighborhood meetings. He further testified:

"As to the effect of these subdistrict reductions, * * * taking the area between 28th and 42d on University, the property on the south side of University was initially assessed 100 per cent and on the north side 85 per cent. In the second district, on one side of 7th street the assessment is at 98 per cent, and on the other side at 67 per cent.

"I made an examination of houses of similar types, dozens of them in different sections of the city for the purpose of comparison and I made a good many photographs. * * * The two properties in Exhibit B·are on Second street between Ovid and Boston one on one side, one on the other side. The house—3214 Second street—is on the west side and it received 2 per cent discount first and then 10 per cent. It is in subdistrict 3 of assessment district VII. Across the street is another house of the same cubic contents and virtually the same unit cost per cubic foot; the land value nearly the same; but it was in subdistrict 1 of assessment district VII; it got a 33 per cent discount first and then 2½ per cent. The computed actual value of the house and lot, that is the actual value * * * of the house on west side of the street, was $2,026, and on the east side, $2,266; but after these discounts were applied to the house in a high discount district, he was assessed $1,700, while the house that I computed the value on the east side was assessed at $1,480; which is a good illustration of the fluctuation across the street. These figures are all set out in various exhibits.

"Shown on Exhibit 'C', assessment subdistrict 3, is a property on the right side of Exhibit 'C' located at 1243 East 7th Street, in subdistrict 1, assessment district IV. The house on the left is 740 Sixteenth street, in the third assessment district. That one got 10 per cent discount. The man on this side of the street * * * that is the one I say is assessed at $1,000 less than the other house, and yet is three years newer and its reproduction value, depreciation allowance is $200 greater.

"In Exhibit 'D' the property on the right side is the house —1618 Beaver, in subdistrict 3, assessment district X; * * * and the house B is about three or four blocks away from it in a little district which was assessed at 100 per cent; that is around 1500 30th street. The house A is assessed at $350 less than the house B, yet the reproduction allowance and reproduction value of house A is $800 more than house B and it is eight years newer than house B and they are within five blocks of one another.

"House A on Exhibit 'E' is 3124 Fourth street, subdivision 3 of assessment district VII. That was assessed first at 98 per cent, and house B which is compared to it, is 1824 East Walnut street. It was assessed at 70 per cent. That is in subdistrict 2, assessment district IV. A and B have about the same assessment.

A is eight years older than B, and its reproduction allowance, depreciation value is $800 less than. house B.

"In Exhibit 'F' the house A is 3212 Fourth Street, subdivision 3, assessment district VII, assessed at 98 per cent; while house B is 2729 Capitol Avenue, discount of 43 per cent, subdivision 2 of assessment district V. That house A, Highland Park house, is assessed for $1,600 more than house B, yet the reproduction allowance and depreciation value of house A is only $500 more than house B. The lot values are just about the same.

"In Exhibit 'G' the house, 4337 Pleasant Street, is in subdistrict 2, assessment district IX, assessed at 100 per cent as compared to 5723 Waterbury Circle, which is subdivision 7 of assessment district IX, assessed at 60 per cent. The comment on this is: Why should House A in an older district be assessed $1,300 more than House B, although it is $1,300 less in computed actual value?

"In Exhibit 'H' House A is 1212 Bluff Street, which is off of University Avenue in subdistrict 3, assessment district VIII, assessed 94 per cent as compared with 5800 Waterbury, in subdistrict 7, assessment district IX, assessed at 60 per cent. The comment is: Why should House A in a poorer part of the city get a $1,862 higher assessment than House B in the best residential district when the 100 per cent computed values are about the same?

"Exhibit 'I' is house A 664 31st Street, in subdistrict 2 of assessment district IX, with 100 per cent value as compared to house B, 5807 Waterbury, subdistrict 7, assessment district IX, which got a 40 per cent discount. The comment is: House A is assessed $660 more than house B, yet is eight years older and has a smaller reproduction allowance and depreciation value, and the lot is smaller value, why should House A get only 10 per cent discount from 100 per cent value when House B gets first 40 per cent and then 2½ more?"

Mr. Crosser testified that he compared hundreds of assessments and found such discrepancies running more or less the same. "These that are selected here were only intended to be typical. I tried to study the whole thing as thoroughly as anybody could." .

He further testified regarding the assessments made in the city of Des Moines that: "There were discounts made in some

districts that were not made in others after measurements had been first taken and values computed thereon. The Des Moines assessment is too high in some districts as compared to others and as compared to other cities in the state.''

The objections made by Mr. Crosser were of the discrepancies between the assessment in various districts in Des Moines as compared with each other and as compared with the assessments made in other cities. There is also testimony in the record tending to show that the assessment of the Des Moines properties is comparatively at its actual value while the assessment of properties in other cities in Iowa is to the extent of only 60 per cent of its actual value. Mr. Crosser testified: ''One of my objections is that Des Moines is assessed on a basis of its actual value and some other cities assessed on a 60 per cent basis and we would be paying higher state taxes.''

Written and oral objections were filed and presented to the state board of review by various property owners and taxpayers of the city of Des Moines, including the bureau of municipal research of said city, and after hearing by the state board of assessment and review, on notice to the defendants, the state board of review entered an order directing the local board of review of the city of Des Moines to increase or decrease by certain percentages the assessments made in the various district zones. Thereafter, several supplementary orders, on due notice to the local board of review, were also entered, in which the local board of review was ordered to make certain changes in the percentages of assessments made by the assessor and local board of review. They also provided for due notice to be given to property owners of the final orders made by the local board of review, which also provided for the giving of certain notices to property owners for the purpose of enabling them to take the necessary appeals to the district court if they saw fit.

In its order the state board of review found and determined:

''That all property in the city of Des Moines, Iowa, has not been valued and assessed in the manner and according to the real intent of the law; that all of said assessments have not been made relatively just and uniform in substantial compliance with the law, and that the levy of taxes based thereon will accordingly fail to be relatively just and uniform substantially

as required by law, and that there has been a division of the property of the city of Des Moines into various classes, resulting in discrimination. This Board further finds that, among other things contributing to this result, the assessor has pursued the following method:

"(a) He has separately determined the value of the ground or lots, exclusive of improvements, on an area of front foot basis, taking one hundred per cent of the value thus determined for residence lots, and but 60 per cent of such value as to certain business lots located in assessment district No. 2, as shown by the assessor's cards and work-sheets, with a consequent discrimination against lots in residence districts and in favor of lots in said business district;

"(b) He has determined the cubic contents of the improvements on said ground or lots and ascertained the reproduction cost by using a selected rate per cubic foot for different types of buildings:

"(c) He has then depreciated the property at a selected rate for different types of construction;

"(d) He has added the value of the ground, as determined in (a), to the value of the improvements, as determined in (b) and (c), and treated the whole as representing the value of the property, which hereafter in this Order will be referred to as the computed value of the property.

"The board further finds that the computed value of the improvements, as so determined, is contained on separate cards for the various parcels of real estate, and said cards were in evidence before this Board.

"The Board further finds that the assessor, after determining the computed value, as above, divided the different assessment districts of the city of Des Moines into what are denominated as sub-districts, and in these sub-districts applied and took certain percentages of the computed value, as above determined, as the assessed value, the lowest value so taken in any sub-district being 50 per cent of the original value, and that in other sub-districts varying percentages of the computed value determined as above have been made the assessed value, while in some sub-districts 100 per cent of the computed value so determined has been treated as the assessed value.

"The Board further finds that the City Council of the City of Des Moines, sitting as a local Board of Review, failed to cor-

rect the discrimination thus resulting between the classes of property and the different sub-districts in the City of Des Moines, but, instead, applied different discounts in certain, but not all, sub-districts of the City of Des Moines, in percentages of 2½ per cent; and in the business districts of the City of Des Moines located in Assessment Sub-District No. 2 made no discount, thereby not only continuing, but aggravating, the inequitable method followed and applied by the assessor.

"The Board further finds that the result of the method described herein has been to provide a valuation discriminatory and excessive as to the alleged classes of property and the various sub-district areas in said City, resulting in an arbitrary discrimination against taxpayers as between themselves and as between different sub-district areas in the City, and against the taxing districts of the City of Des Moines as compared with other taxing districts within the County and within the State."

We have carefully examined the evidence, and it is our conclusion that the foregoing findings of the board are substantiated by the record in the case. Under the orders of the state board to the local board, that board was ordered and directed to increase or reduce the assessments made in the various districts by certain percentages. The record shows that the local board refused to carry out the orders of the state board and because of such refusal, this action was commenced to compel the enforcement of its orders.

Appellee contends and the lower court found that the state board of assessment and review exceeded the powers and jurisdiction granted the state board in attempting to exercise certain duties and powers not expressly or impliedly delegated to the state board of review by the legislature, and was acting in a sphere in which it had no jurisdiction and was entirely without authority to so act.

Appellant contends that the court erred in so holding but, on the contrary, maintains that the action of the state board was fully justified and authorized by the provisions of chapter 329-c2, sec. 6943-c11 et seq., of the Code of 1935, as amended by the 47th G. A., ch. 188, sec. 4 et seq.

Appellee contends that because there was a provision in section 6943-c27, par. 9, of the Code of 1935, authorizing the state board of review "to raise or lower the valuation of any piece

of property in any taxing district when in their judgment it is necessary," and that because said authority was withdrawn by striking out the foregoing provision from par. 9 of section 6943-c27, the state board now has no authority to make an adjustment or order a revaluation of the property under the facts in this case.

The real question, therefore, is whether or not under the law as it now stands the state board of assessment and review has authority to make an adjustment and review of the official acts of the local board of review, under its power of supervision as provided by the present statute as amended. The salient parts of the present statute, so far as material to this action, are as follows:

"6943-c27. Powers. In addition to the powers and duties transferred to the state board of assessment and review, said board shall have and assume the following powers and duties:

"1. To have and exercise general supervision over the administration of the assessment and tax laws of the state, over boards of supervisors and all other officers or boards of assessment and levy in the performance of their official duties, in all matters relating to assessments and taxation, to the end that all assessments of property and taxes levied thereon be made relatively just and uniform in substantial compliance with the law.

"2. * * *

"3. To confer with, advise and direct boards of supervisors, boards of review and others obligated by law to make levies and assessments, as to their duties under the laws.

"4. * * *

"5. * * *

"6. To hold public hearing either at the seat of government or elsewhere in the state, and tax the costs thereof; to summon and compel witnesses to appear and give testimony, to administer oaths to said witnesses and to compel said witnesses to produce for examination records, books, papers, and documents relating to any matter which the board shall have the authority to investigate or determine. * * *

"7. * * *

"8. To investigate the work and methods of boards of review, boards of supervisors or other public officers, in the assessment, equalization and taxation of all kinds of property, and

for that purpose the board, and members or employees thereof may visit the counties or localities when deemed necessary so to do.

"9. To require any board of review at any time after its adjournment to reconvene and to make such orders as the state board of assessment and review shall determine are just and necessary; to direct and order any county board of equalization to raise or lower the valuation of the property, real or personal, in any township, town, city or taxing district, to order and direct any county board of equalization to raise or lower the valuation of any class or classes of property in any township, town, city or taxing district, and generally to make any order or direction to any county board of equalization as to the valuation of any property, or any class of property, in any township, town, city, county or taxing district, which in the judgment of the board may seem just and necessary, to the end that all property shall be valued and assessed in the manner and according to the real intent of the law.

"10. To carefully examine into all cases where evasion or violation of the law for assessment and taxation of property is alleged, complained of, or discovered, and to ascertain wherein existing laws are defective or are improperly or negligently administered, and cause to be instituted such proceedings as will remedy improper or negligent administration of the laws relating to the assessment or taxation of property."

Among the provisions of the foregoing statute, we find that par. 1 gives the state board power to "*exercise general supervision over the administration of the assessment and tax laws of the state,* over boards of supervisors *and all other officers or boards of assessment and levy in the performance of their official duties, in all matters relating to assessments and taxation, to the end that all assessments of property and taxes levied thereon be made relatively just and uniform.*" (Italics ours.)

Par. 8 thereof gives the state board power "*to investigate the the work and methods of boards of review, boards of supervisors, or other public officers, in the assessment, equalization and taxation of all kinds of property.*" (Italics ours.)

Par. 9 of the foregoing section expressly gives the state board power "*to require any board of review* at any time after its adjournment *to reconvene and to make such orders as the*

*state board of assessment and review shall determine are just and necessary.''* (Italics ours.)

The local board of review of the city of Des Moines is necessarily included in this provision of par. 9, section 6943-c27, and under it, if that statute means anything, the state board must be held to have power and authority ''to require *any board of review,''* which necessarily includes the local board of the city of Des Moines, ''to reconvene and to make such orders as the state board * * * shall determine are just and necessary.''

Among the provisions of par. 9 of section 6943-c27, as it appears in the 1935 Code before the amendment in ch. 188, 47th G. A., the state board had power ''to raise or lower the valuation of any piece of property in any taxing district when in their judgment it is necessary.'' The legislature in the 47th G. A., ch. 188, struck out the foregoing provision of par. 9, but left in the power ''to require *any board of review* at any time after its adjournment to reconvene and to make such orders as the state board of assessment and review shall determine are just and necessary.''

Appellee contends that because the legislature struck out the words ''to raise or lower the valuation of any piece of property in any taxing district,'' in said par. 9 of the 1935 Code, the state board no longer has the power to require *''any board of review* * * * to make such orders as the state board of assessment and review shall determine are just and necessary.'' This power, however, is still contained in par. 9 of section 6943-c27 as amended; and it is our conclusion that the amendment of the 47th G. A., ch. 188, sec. 6, striking out the provision authorizing the state board ''to raise or lower the valuation of any piece of property in any taxing district'' does not necessarily withdraw the power of the state board ''to require *any board of review* * * * to make such orders as the state board of assessment and review shall determine are just and necessary.'' Striking out the one does not affect the other.

While the power ''to raise or lower the valuation of any piece of property in any taxing district'' was stricken out, the other provision empowering the state board ''to require *any board of review* * * * to reconvene and to make such orders as 'the state board * * * shall determine are just and necessary'' still remains. Paragraphs 1, 3, 8, and 9 of the present statute, as amended, therefore empower the state board to exercise ''gen-

866

eral supervision over the administration of the assessment and tax laws of the state," and empower it *"to require any board of review \* \*.\* to make such* orders as the state board of assessment and review shall determine are just and necessary." The statute as amended must be construed as it exists after the amendment.

In McGuire v. C. B. & Q. Ry. Co., 131 Iowa 340, 1. c. 345, 108 N. W. 902, 1. c. 904, 33 L..R. A. (N. S.) 706, this court said:

"There is no rule of interpretation requiring us to give the amended statute a meaning which differs in any degree from that which would have been given it, had the matter of amendment been made a part of the original act. In other words, unless the contrary intent is clearly indicated, the amended statute is to be construed as if the original statute had been repealed and a new and independent act in the amended form had been adopted." (Citing cases).

In 59 C. J. 1096, sec. 647, it is said:

"An amended act is ordinarily to be construed as if the original statute had been repealed, and a new and independent act in the amended form had been adopted in its stead; or, as frequently stated by the courts, so far as regards any action after the adoption of the amendment, as if the statute had been originally enacted in its amended form. The amendment becomes a part of the original statute as if it had always been contained therein, unless such amendment involves the abrogation of contractual relations between the state and others. Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment."

This rule is also recognized in Iowa. Iowa Electric Co. v. Incorporated Town of Winthrop, 198 Iowa 196, 198 N. W. 14; New York Life Insurance Company v. Burbank, 209 Iowa 199, 206, 216 N. W. 742. The general rule is that an amended statute is to be given the meaning that it would have had if it had read from the beginning as amended. State v. Spiegel, 91 Ohio St. 13, 109 N. E. 523; United States v. LaFranca, 282 U. S. 568, 51 S. Ct. 278, 75 L. Ed. 551-557; Balanced Rock Scenic Attractions v. Town of Manitou, 10 Cir., 38 Fed. 2d 28.

The various provisions of the statute above quoted, as

it now exists, clearly give the state ;board of review the power and authority of *supervising and reviewing* the official acts of subordinate assessing officials and boards, and of compelling them to correct any apparent errors or irregularities as determined by the state board of review.

"The purpose for which a state board of assessment and review was created, * * * as expressed by the legislature, is that 'all assessments of property and taxes levied thereon be made relatively just and uniform in substantial compliance with law.' * * * " State ex rel. Iowa State Board of Assessment & Review v. Board of Supervisors, 211 Iowa 1116, 1120, 235 N. W. 303, 305. The aim of the legislature in creating the state board of assessment and review was to accomplish uniformity, equality and justice.

In Smith v. Sioux City Stock Yards Co., 219 Iowa 1142, 1151, 260 N. W. 531, 536, we said:

"Our previous legislation on the subject of assessment and the equalization of taxation so that all would bear the burden of taxation as near as was practically possible was a patchwork, first starting with about the earliest revenue providing acts, and here and there amended until we have gathered within the Code of 1927 the results up to then of such piecemeal building up, resulting in a complicated system *with no central authority,* and with no practicable way of bringing about a statewide system that would insure even an approach to uniformity in the burden of taxation. So *in this act the legislature wisely created an administrative tribunal clothed with judicial power, subject to appeal to the courts, to be the ultimate authority to bring about the things desired.* This was the mischief to be remedied, and the means taken to remedy this mischief. (Italics ours.)

Likewise in discussing a similar statute in State v. Cook, 175 Wash. 364, 27 P. 2d 1075, l. c. 1079, the Supreme Court of Washington said:

"The state board of equalization is a constituent part of the machinery and process for assessment and taxation, under the statutes herein already referred to. State ex rel. Thompson v. Nichols, supra [29 Wash. 159, 69 P. 771]; Wallace v. Bullen, supra [6 Okla. 757, 54 P. 974]. The completed assessment is the

result of the progressive and collective judgment of the several assessing and equalizing bodies. Changes may occur in the progress of the procedure, but the final determination of the matter rests with the state board, in the proper exercise of its discretion."

Of similar import are: Yawkey v. Wisconsin Tax Commission, 212 Wis. 357, 248 N. W. 773, 250 N. W. 7; People ex rel. State Board of Equalization v. Pitcher, 61 Colo. 149, 156 P. 812, l. c. 818, Ann. Cas. 1918D, 1185.

The language used in par. 1 of sec. 6943-c27 is clear and unambiguous, and the language in itself is a sufficient construction of the statute. By it the board is expressly given the power *"to have and exercise general supervision over the administration of the assessment and tax laws, * * * over * * * all other officers or boards of assessment and levy in the performance of their official duties, in all matters relating to assessments and taxation,* [and to have and exercise this supervision] to the end that all assessments of property * * * be made relatively just and uniform."

This language of the legislature gives the state board *general supervision,* not only over the administration of assessment laws, but over all other officers and boards of assessment, and declares that such supervision extends to the performance of official duties in all matters relating to assessments.

This court in construing the term "supervision" in the case of State v. C. M. & St. P. R. Co., 152 Iowa 317, l. c. 321, 130 N. W. 802, l. c. 804, said:

"The power of supervision given by section 2112 is broad, and in our judgment sufficient warrant alone for the order in question. To supervise is to superintend, to direct, to have charge over, with the power of direction. Webster's International Dictionary. The Secretary of the Interior, being charged by the United States statutes with the supervision of the office relating to the public lands, was held to have the power to review all the acts of the local officers, and to correct and direct a correction of any error committed by them. * * * An Act, giving a board of transportation general supervision of railroads, clothes the board with the necessary powers for such purpose."

In construing a statute almost identical with the Iowa

statute on this subject, the Supreme Court of Washington, in Great Northern Ry. Company v. Snohomish County, 48 Wash. 478, 93 P. 924, l. c. 927, said:

"The state board of tax commissioners is given general supervision over assessors and county boards of equalization, to the end that all taxable property shall be placed on the assessment rolls 'and equalized as between the different counties and municipalities, so that equality of taxation shall be secured according to the provisions of law. What is meant by 'general supervision'? Counsel for respondents contend that it means to confer with, to advise, and that the board acts in an advisory capacity only. We cannot believe that the Legislature went through the idle formality of creating a board thus impotent. Defining the term 'general supervision' in Vantongeren v. Heffernan, 5 Dak. 180, 38 N. W. 52, the court said: 'The Secretary of the Interior, and, under his direction, the Commissioner of the General Land Office, has a general "supervision over all public business relating to the public lands." What is meant by "supervision"? Webster says supervision means "to oversee for direction; to superintend; to inspect; as to supervise the press for correction." And, used in its general and accepted meaning, the Secretary has the power to oversee all the acts of the local officers for their direction, or, as illustrated by Mr. Webster, he has the power to supervise their acts for the purpose of correcting the same; 'and the same power is exercised by the Commissioner under the Secretary of the Interior. It is clear, then, that a fair construction of the statute gives the Secretary of the Interior, and, under his direction, the Commissioner of the General Land Office, the power to review all the acts of the local officers, and to correct, or direct a correction of, any errors committed by them. Any less power than this would make the "supervision" an idle act—a mere overlooking without power of correction or suggestion.' Defining the like term in State v. F. E. & M. V. R. Co., 22 Neb. 313, 35 N. W. 118, the court said: 'Webster defines the word "supervision" to be "the act of overseeing; inspection; superintending." The board therefore is clothed with the power of overseeing, inspecting, and superintending the railways within the state, for the purpose of carrying into effect the provisions of this act, and they are clothed with the power to prevent unjust discrimination against either persons or places.' It seems

to us that the term 'general supervision' is correctly defined in these cases. Certainly a person or officer who can only advise or suggest to another has no general supervision over him, his acts or his conduct. The respondents contend that such a construction will substantially do away with county assessors and county board of equalization, but this conclusion does not follow. How far the state board of tax commissioners may interfere with the local authorities in the valuation of local property for the purpose of local taxation, or how far the Legislature may authorize such interference, is not involved in this case.''

Under the facts in this case, if a local board of assessment and review has practiced an unjust and discriminatory method of assessment and taxation, as the state board found and determined did exist in this case, then the state board, under the statute hereinabove set out, must have had the power and authority to order the assessment corrected, otherwise it would be meaningless.

After the office computations were made by the assessing officers, the unequal ''district discounts'' were applied to the valuations obtained from the measured value system. This was not in accordance with the plan which the public had been led to believe would be applied by the assessor and other public officials. The deduction for ''district discounts'' varied according to location. In some zones it was as great as 50 per cent, in others only 2 per cent.

The order of the state board of review is a determination that the scheme of valuation, which the local board for the city of Des Moines approved, resulted in many inequalities in the valuation of all property in each of the sectional areas where many unequal percentages were applied to the appraised and computed values. The inequalities found to exist were due to the application by the assessor and the local board of a rule applied in fixing assessable values whereby the location of certain property in any one particular sectional area was the sole test as to whether that item was to be valued at 50 per cent or 75 per cent of the appraised value of the site, plus the computed value of the improvements, or on some other percentage basis arbitrarily selected for all real estate in that zone. The state board determined that this method resulted in discrimination

and that such assessment so arrived at was erroneous and lacked uniformity.

It is our conclusion that the facts disclosed by the evidence in this case were amply sufficient to give the state board of review jurisdiction to order the correction of such discriminations as they determined were the result of the unjust action taken by the city assessor and local board of review.

The order here made was not equivalent to a new or original assessment nor a revision of individual assessments, but dealt with the aggregate valuation in the several zones. It conformed to and corrected the unequal discounts which it determined had resulted in discrimination and is the kind of an order which the state board of assessment and review has authority to make. Code section 7141; Greene v. Louisville & I. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; South Spring R. & C. Co. v. State Board of Equalization, 18 N. M. 531, 139 P. 159; Appeal of McNeal, 35 Okla. 17, 128 P. 285; Mac-Ginnis v. Denver Land Co., 90 Colo. 72, 6 P. 2d 919.

We are constrained to hold that the state board proceeded within the scope of its express powers. Its corrective order was not a reassessment nor was it directed to the individual assessments of individual taxpayers. It merely ordered the pursuance of a uniform mode of valuation for assessments as a substitute for the mode it determined led to discrimination in the valuation of all the real estate in Des Moines for assessment.

For the reasons hereinabove expressed, the judgment of the lower court is hereby reversed.—Reversed.

DONEGAN, RICHARDS, HAMILTON, and STIGER, JJ., concur.

SAGER, C. J., concurs in the result.